(No. 2683.   Jan. 26, 1924.)

JONES v. JERNIGAN et al.

SYLLABUS BY THE COURT.

1. The admission of evidence "subject to the objection" is equivalent to an overruling of the objection.

2. When an offer to compromise a claim is made, and the admission of the truth of the facts on which the claim is based is hypothetical only, such admission cannot be treated as an assertion representing a party's actual belief, and cannot, therefore, be received in evidence; but, if the admission is unconditional, and made without any regard to the circumstances which accompany it, it should be received in evidence. The rule excluding an offer of compromise is based upon the proposition that such an offer does not ordinarily proceed from and imply a belief that the adversary's claim is well founded, but rather that the further prosecution of the claim, whether well-founded or not, would in any event cause such annoyance as is preferably avoided by the payment of the sum offered, and the offer therefore does not signify an admission of the alleged facts on which the claim is based.

3. A finding of fact, not supported by substantial evidence, cannot be sustained on appeal, and a judgment based on such finding is itself without support.

4. The measure of damages for the breach of a contract for the exchange of property, by the refusal of one party to make delivery upon performance by the other, is the value of the property which should have been transferred.

5. Where the parties to a contract of exchange have fixed values on the respective properties for the purpose of computing the cash difference to be paid upon ascertaining the respective numbers or quantities, and without reference to actual value neither party is bound, for other purposes, by the values so fixed; but, in the absence of any evidence of actual value, the price fixed by the parties should be considered prima facie the value of the property, and is some evidence which may serve as a basis for determining the amount of damages.

6. Where the court assesses the correct amount of damages, but by the application of an erroneous rule, the error is one of pure technicality, and not one of substance, and is not prejudicial.

7. The time at which the title to property passes, under the terms of a contract of sale or exchange, depends largely on the intention of the parties, and, in the absence of a clear expression of such intention, presents a question of fact rather than one of law. Rules of the common law by which the court should be guided in determining the intention of the parties stated and discussed.

Appeal from District Court, Socorro County; Owen, Judge.

Action by C. A. Jones against G. W. Jernigan and others. From a judgment for plaintiff, defendants appeal. Reversed and remanded for new trial. ·

W. H. Winter and Winter, McBroom & Scott, all of El Paso, Tex., for appellants.

Lee R. York, of Abilene, Tex., for appellee.

OINION OF THE COURT.

BOTTS, J. In August and September, 1920, the plaintiff, appellee here, was the owner of a herd of cattle in Socorro county, and the defendants, appellants here, were the owners of a flock of goats in Otero county, said goats then being intermingled with goats of other owners, among them being one Boyles, who was running defendants' goats on the shares, he to get half the mohair and half the increase. An oral agreement was entered into between plaintiff

and defendants whereby the former was to exchange his cattle for defendants' goats, and as a basis for adjusting any difference that might exist upon the exchange by reason of the property of one of the contracting parties being of greater value than that of the other, neither party then knowing the exact number of head in their respective properties, certain values per head for different classes of cattle and certain values per head for certain classes of goats were fixed. No part of the contract was embodied in writing, but the court found as a fact that the contract entered into was substantially as follows:

"Defendants agreed to take plaintiff's cattle at the following prices, to wit: All cows with calves, except two, of a lower grade, at $65 per head for cows and calf; said two cows and calves at $50 per head each for said cows and calves; all steers three years old and upwards at $65 per head; two 2 year old steers at $50 per head; all yearlings at $37.50 per head; and all dry cows at $50 per head.

"And plaintiff agreed to take defendants' goats at the following prices, to wit: 100 head to be classified as old goats at $2 per head; all other goats at $4 per head, and all kids at $1.50 per head; said goats to be sheared before delivery.

"And it was further agreed that the party whose animals upon delivery, at the above prices, amounted to more than the animals of the other party upon delivery at said prices, should be paid by the other party the difference in cash.

"And it was further agreed that plaintiff should with all convenient speed gather and drive his cattle to or near Cutter, N. M., and there deliver them to the defendant's employees; and, in case defendants' employees did not meet him at Cutter, plaintiff was to drive his cattle on for a day or two or until met by defendants or their employees, when said cattle were to be delivered and tallied out to the defendants. And it was mutually understood and agreed that upon the delivery of said cattle to defendants plaintiff was at liberty to return to his home and move his family to Prescott, Ariz., and then return to the defendants' ranch and receive said goats."

While this finding is challenged by the defendants, the evidence seems to be uncontradicted in support of the whole except as to the last paragraph. There was dispute in the evidence as to the place where the plaintiff should deliver the cattle, and it was also disputed that he might return home after delivering the cattle

and move his family to Prescott, Ariz., before going to defendants' ranch to receive the goats. The plaintiff and some of his witnesses testified directly in support of this part of the finding, while the defendants and some of their witnesses testified to the contrary, although some of the defendants' testimony bore out the finding. This being the case, the findings will not be disturbed in this court.

The plaintiff delivered his cattle to the defendants and then returned to his home in Socorro county and removed his family to Prescott, Ariz., but before he was able to return to defendants' ranch to get the goats a severe storm arose on the goat ranch, resulting in the loss of a large percentage of the goats. The total aggregate exchange price of the cattle, as finally determined by count, under the terms of the contract, was $5,355, and it is conceded by all parties that the defendants had a total of 1,506 goats prior to the storm, which could then have been delivered, as also determined by count subsequent to the agreement, of a total aggregate exchange price, under the terms of the contract, of $4,949, leaving under the terms of the contract, a balance due from defendants to plaintiff of $406, if the contract was or could have been executed before the storm. When the plaintiff went to receive the goats, and found that a large portion thereof had been destroyed, a controversy arose as to who should stand the loss, and as a consequence, the remnant of goats was not delivered nor received, and the plaintiff brought this action for the breach of the contract. He prevailed in the court below, damages being fixed at the agreed value of the cattle, and the case is now here for review.

The court found that the contract had been breached by the defendants as follows:

"Plaintiff thereupon requested that the remnant of said goats be delivered to him, which the defendants refused except upon the condition that plaintiff would waive payment in money of the balance due on the price of said cattle."

As a matter of law, the court concluded that the

contract had been breached by the defendants, the court's conclusion No. 1 being as follows:

"Defendants breached their contract on or about November 4, 1920, by refusing to deliver the remnant of said goats except upon the condition that plaintiff would waive payment in money of the balance due him."

Defendants make the point that this finding and conclusion (1) are unsupported by the evidence unless (2) it be by evidence admitted by the court over defendants' valid objection.

The finding now under consideration is the only one made by the court upon which the conclusion of breach of the contract by the defendants is or can be predicated. The finding, therefore, is a material one, and, if unsupported by substantial, competent evidence, the judgment must fail for want of breach by defendants of the contract in suit.

Assuming, for the purpose of our consideration of this point, that the loss of the goats by storm fell upon the defendants, a point which we shall discuss later, and bearing in mind that the defendants were to trade all their goats to plaintiff for all his cattle, with the difference payable in cash by one party or the other, depending on the final count, and neither party having contracted to deliver any specific number of head, it would seem to follow that it was plaintiff's duty to receive defendant's goats, even though a large number of them had perished, and that it was defendants' duty to deliver said goats and pay the balance in cash. It is to be noted that the breach of the contract found by the court is not based upon any refusal of the defendants to pay the cash balance coming to plaintiff, but upon their refusal to deliver the goats at all unless plaintiff would waive the cash payment.

We shall first consider the evidence said by the plaintiff to support the finding, which is not covered by defendants' objection. It appears therefrom that, when plaintiff went to the goat ranch for the

purpose of receiving the goats, and there found that a large number of them had perished in the storm, the only persons present were the plaintiff and the defendant Henry Jernigan. Said defendant did not testify as to what took place between him and the plaintiff at that time, and the only evidence we have on the subject is that of plaintiff himself. It appears that the controversy which arose was with reference to who should stand the loss, the plaintiff insisting that the loss was on the defendant, and the defendant insisting that title to the goats had passed before the storm, and that the loss must be borne by plaintiff. It also appears that at that time defendants were of the opinion that the goats in their herd, prior to the storm, numbered considerably more than was afterwards demonstrated by count, and that by reason thereof there was something like a difference of $600 which should be paid in cash by plaintiff to defendants. Without relating plaintiff's evidence in detail as to what then took place, it is sufficient to say that the substance of it is that plaintiff offered to take the remnant of the goats if defendants would go ahead and pay the difference, to which defendants would not agree, and that plaintiff did not at any time offer to take and receive the goats except upon the condition that defendants would pay what plaintiff considered was the cash difference, to which condition defendants refused to agree. In the light of the plain evidence that their controversy was with reference to who was the owner of the goats at the time of the loss, it would seem that there was more of a refusal on the part of the plaintiff to receive the goats than there was on the part of the defendants to deliver them. Nothing was said by the defendants, so far as the evidence discloses, about the plaintiff waiving the payment of a cash difference, and a refusal of the defendants to agree to the condition coupled by the plaintiff with his offer to receive the goats is not a refusal to deliver the goats. This evidence, therefore, clearly does not support the finding that the defendants refused

to deliver the goats unless plaintiff would waive the payment of a cash difference.

[1] Some days thereafter plaintiff and his attorney, Mr. York, went back to the Jernigan ranch for the purpose of trying to effect a compromise and avoid a lawsuit, the purpose of their visit being freely admitted in their testimony. Neither of the defendants testified as to what then took place between them and plaintiff, and the only testimony on the point is that of the plaintiff and his attorney, objection being made by the defendants to all thereof on the ground that what was there said and done was inadmissible since it was for the purpose of trying to effect a compromise. Upon objection being made, the court admitted the evidence "subject to the objection." It is probable that no attorney has ever yet been able to determine, to his own satisfaction, just what is intended by a trial court when evidence is admitted "subject to the objection," but possibly it is intended thereby to recognize that objection is being made, notwithstanding which the evidence is admitted, which would be equivalent to an overruling of the objection. At any rate, we shall here give that effect to the ruling of the court.

We are not here concerned with the rule that, where it does not appear that the trial court considered inadmissible testimony in determining the case, its admission will not constitute reversible error (Crawford v. Gurley, 23 N. M. 659, 170 Pac. 736), since, as we have seen, there is no other evidence supporting the finding complained of, and therefore, if the objectionable evidence tends to support the finding, it must have been considered by the court.

Appellee's sole argument contrary to appellants' contention is as follows:

"While it appears from the testimony of both Jones and York that they went to Jernigan to settle the controversy out of court, there is absolutely nothing to show that any of the statements were made under the idea or

for the purpose of compromising. However, there is substantial proof on this point, without reference to this incident."

Appellee then quotes from the evidence of Jones, which we have already considered and found insufficient to sustain the finding.

The mission of plaintiff and his attorney to defendants' ranch was not to demand delivery of the goats or the payment of a balance due, or otherwise to procure performance of the contract on the part of defendants, but to effect a compromise. If the contract was breached by defendants, it had already been breached before that time, and under the circumstances, the testimony of plaintiff and his attorney as to what transpired on that visit amounts to an effort to prove the previous breach by the admissions of the defendants. The question now before us is therefore whether such admissions, if any were made, under the circumstances, were admissible.

[2]   The true rule is probably not as broad as contended for by defendants, and may be stated as follows:' Where an offer to compromise a claim is made, and the admission of the truth of the facts on which the claim is based is hypothetical only, such admission cannot be treated as an assertion representing the party's actual belief, and therefore cannot be received in evidence, but, if the admission is unconditional, and made without any regard to the circumstances which accompany it, it should be received in evidence. The rule excluding an offer of compromise is based upon the proposition that such an offer does not ordinarily proceed from and imply a belief that the adversary's claim is well founded, but rather that the further prosecution of the claim, whether well-founded or not, would in any event cause such annoyance as is preferably avoided by the payment of the sum offered, and the offer therefore does not signify an admission at all. Wig. on Ev. § 1061.

The testimony objected to is epitomized in the statement of the plaintiff:

"Mr. Jernigan said that he figured there would be about $600 coming to him; that the goats would figure about $600 more money than the cattle; and if I wanted to take the remnant of goats he was willing to square off with me—if I would take this remnant of goats, he would square off this $600."

And in the statement of the witness York:

"Mr. Jernigan said that if the goats had been delivered there would have been about $600 coming to him, but that he was willing to lose that and turn over the other goats that were living."

Bearing in mind that, as before stated, the controversy seemed to be over the question as to who should bear the loss of the dead goats, and that defendants then thought they had a sufficient number of goats before the storm, when, as they contend, they should have been received by plaintiff, to make a cash balance of some $600 due from plaintiff to defendants, it appears, aside now from any question of whether the evidence complained of, if admissible, supports the finding, that defendants were offering to plaintiff, in order to effect the compromise which they were all striving for, to waive the payment by plaintiff of a part of defendants' claim. So, even if an admission of a previous breach of the contract by defendants can be found in this testimony, it is certainly a hypothetical admission within the meaning of the rule above stated, made in an effort on the part of the defendants to buy their peace with plaintiff. The testimony therefore was inadmissible.

[3] This leaves the finding of a breach of the contract unsupported by substantial evidence, and therefore it cannot be sustained on this appeal. Manby v. Voorhees, 27 N. M. 511, 203 Pac. 543. Since the action is based upon a breach of the contract, and the breach found by the trial court being so unsupported, the judgment itself is without support.

[4] Since the case must be reversed for a new

trial because of the erroneous finding, it may be of assistance to the trial court for us to discuss two other questions raised by appellants. The first of these relates to the measure of damages. Necessarily, any discussion of this point must rest on the assumption that there had been a breach of the contract, and, for the present, we shall so assume, since the ruling of the court here complained of was based on the finding of breach, although, as we have seen, the finding was erroneous.

The defendants requested the court to find that the transaction between the parties was a contract for the exchange of property, and not a sale. This finding the court refused to make. At the request of the plaintiff, the court fixed the measure of damages by conclusion No. 2, as follows:

"The measure of plaintiff's damages is the price of the cattle delivered as determined by the terms of the contract, to wit, the sum of $5,355, for which sum, with interest at the rate of 6 per cent. per annum from November 4, 1920, plaintiff is entitled to judgment."

Defendants contend that the requested finding should have been made, and that by conclusion No. 2, the court has adopted the wrong measure of damages. The defendants are correct in both particulars. An examination of the record discloses that during the course of the trial defendants offered evidence having for its purpose to prove that the transaction was a trade or exchange of property, and not a sale, whereupon the plaintiff admitted defendants' contention in the following language:

"We admit that the transaction was an exchange and not a sale; that is admitted in the pleadings."

Thereupon the defendants announced that they would offer no further testimony on that point. It plainly appears to be, therefore, an admitted fact that the transaction was not a sale but an exchange of property, and, if the fact is material to a determination of this controversy, it should have been found as requested.

Defendants contend that the fact is material, since a different rule for the measurement of damages must be applied in an exchange from that applied where there is an outright sale, in that by the latter the parties are bound by the prices fixed in their contract, while in the former they are not so bound. Applying the rule contended for to the present case, defendants say: (1) That if any damages should have been assessed against defendants they should have been measured by the value of the goats contracted to be exchanged for the cattle, plus the $406 conceded to be the difference between the exchange prices fixed by the parties; and (2) that there is no evidence in the record as to the value of the goats.

The rule with reference to the measure of damages upon the breach of a contract for the exchange of property is that, where one of the parties to a contract for the exchange of property has performed his part of the agreement, the refusal of the other to transfer the chattel or other property according to the contract renders him liable in damages for the value of the property he should have transferred. Lucas v. Heaton, 1 Ind. 264; note, 15 Ann. Cas. 475. We think the rule requires no elaboration. To suppose a simple case: If A. and B. agree to trade horses, and A. delivers, but B refuses to do so, A's measure of damages would be the value of the horse which B. refused to deliver.

[5] The court found, upon the request of the defendants, that no evidence was offered as to the market value of the cattle, and that no evidence whatsoever was offered as to the value of the goats. This finding is fully supported by the record. Upon that situation the defendants argue that there is nothing before the court upon which an assessment of damages can be based. Plaintiff, on the other hand, argues that the parties, by their contract, which was found by the court, as hereinbefore quoted, agreed as to the respective values of the cattle and goats, and that the value

of the property, for the purpose of assessment of damages, is fixed by that contract.   Upon this point the courts are not in harmony, but we think the rule announced by the Supreme Court of Iowa in the case of Fagan v. Hook, 134 Iowa, 381, 105 N. W. 155, 111 N. W. 981, is supported by a majority of the decisions, as well as by the better reasoning.   The court, on rehearing, said:

"If parties definitely settle upon and agree to the value of their respective properties for the purpose of sale one to the other, no inquiry concerning actual values is permissible, as these are put beyound question by those having to determine the worth thereof for themselves, and thereby fix the measure of damages in event of a breach. If, on the other hand, the agreement is a mere trading contract, by the terms of which one party is to exchange certain property belonging to him for that of the other upon or by the payment of the difference, and to this end and for the purpose solely of accomplishing this result, but not to ascertain their actual values, estimates are placed on the respective properties, then neither party is bound by the values so estimated, and the measure of damages to be applied is that of quantum meruit.   In other words, the values designated in the agreement to be binding on the parties must appear to have been specified as such, and not as merely incidental to some other purpose not involving the intention of deciding the true worth. The criterion in determining whether there has been a sale or exchange of personal property is whether there is a fixed price at which the things are to be exchanged.   If there is such fixed price, the transaction is a sale; but, if there is not, the transaction is an exchange."

See, also, Lomen v. Danaher, 165 Wis. 15, 161 N. W. 14; Brunsvold v. Medgorden, 171 Iowa, 413, 153 N. W. 163; Hamburger v. Berman, 203 Mich. 78, 168 N. W. 925, 170 N. W. 555; Pierson v. Spaulding, 61 Mich. 90, 27 N. W. 865; note, 15 Ann. Cas. 475.

With the criterion announced by the Iowa court for determining whether the transaction is a sale or an exchange of property we are not concerned, inasmuch as it is admitted that we are here dealing with an exchange of property, and not a sale.   Applying the rule to the case in hand, it follows that the proper measure of plaintiff's damages was the value of the goats contracted to be delivered, plus $406, and that the

parties were not bound by the value of the goats fixed in the contract for exchange.

But, while the contract price, as fixed, had no binding effect upon the parties, it does not follow that it could not be considered in determining the value of the goats. It may have been that the values fixed were entirely fictitious and nominal, and solely for the purpose of exchange, and without any reference to actual values; but the court has no right to presume that to be the case, and, in the absence of any evidence to the contrary, the price as fixed by the parties should be considered as prima facie the value of the property, and is some evidence which may serve as a basis for the determination of the amount of damages. Norton v. Hinecker, 137 Iowa, 750, 115 N. W. 612, 15 Ann. Cas. 474; Redman v. Adams, 165 Mo. 60, 65 S. W. 300.

[6] If we apply the measure of damages which the court should have applied to the facts in this case, giving the valuation by the parties its prima facie force, we find the value of the goats, based upon the number and grades which it is conceded the defendants owned, to be $4,949, which, added to the $406, conceded to be the difference in values as fixed by the parties between the goats and the cattle, produces the sum of $5,455, the exact amount of damages found by the court. In short, the court found the correct amount of damages under the facts in the case, but by application of an erroneous rule. The error, therefore, is one of pure technicality, and not one of substance. Since the same damages would have been assessed by the application of the erroneous rule, defendants were not prejudiced by the error, and the judgment of the court below should not be reversed on this error alone. Lockhart v. Wills, 9 N. M. 344, 54 Pac. 336; In re Englehart, 17 N. M. 304, 128 Pac. 67, 45 L. R. A. (N. S) 237, Ann. Cas. 1915A, 54; Goldenberg v. Law, 17 N. M. 546, 131 Pac. 499; Colbert v. Journal Publishing Co., 19 N. M. 156, 142 Pac. 146; Trauer v. Meyers, 19 N. M. 490, 147 Pac. 458. See, also, Redman v. Adams,

supra.   However, if it again becomes necessary to assess damages, the correct measure should be applied.

[7]   The remaining question is one which has been the very source and life of this entire controversy.   It is:   Who should stand the loss of the goats destroyed by the storm?   In other words, Had the title passed from the defendants to the plaintiff at that time?   At that time did the bargain amount to an actual sale of the goats, or was it an executory contract to sell?   If the former, the title to the property was in the plaintiff, and the loss is his; if the latter, the title had not yet passed, and the loss is on the defendants.   The parties had a perfect right to make either contract; the difficulty lies only in determining, under the facts of this case, which they did in fact make.   Mr. Benjamin, in his work on Sales, by way of preliminary discussion of the question now before us (page 213 et seq.) has used language so applicable to our inquiry that we quote freely:

"Both these contracts being equally legal and valid, it is obvious that whenever a dispute arises as to the true character of an agreement the question is one rather of fact than of law.   The agreement is just what the parties intended to make it.   If that intention is clearly and unequivocally manifested, cadit quaestio.   But parties very frequently fail to express their intentions, or they manifest them go imperfectly as to leave it doubtful what they really mean, and when this is the case the courts have applied certain rules of construction, which in most instances furnish conclusive tests for determining the controversy.

"When the specific goods to which the bargain is to attach are not agreed on, it is clear that the parties can only contemplate an executory agreement.   If A. buys from B. ten sheep, to be delivered hereafter, or ten sheep out of a flock of fifty, whether A. is to select them, or B. is to choose which he will deliver, or any other mode of separating the ten sheep from the remainder be agreed on, it is plain that no ten sheep in the flock can have changed owners by the mere contract; that something more must be done before it can be true that any particular sheep can be said to have ceased to belong to B., and to have become the property of A.   But, on the other hand, the goods sold may be specific, as if there be in the case supposed only ten sheep in a flock, and A. agrees to buy them all. In such case there may remain nothing to be done to the sheep, and the bargain may be for immediate delivery, or

it may be that the vendor is to have the right to shear them before delivery, or may be bound to fatten them, or furnish pasture for a certain time before the buyer takes them, or they may be sold at a certain price, by weight, or various other circumstances may occur which leave it doubtful whether the real intention of the parties is that the sale is to take effect after the sheep have been sheared, or fattened. or weighed, as the case may be, or whether the sheep are to become at once the property of the buyer, subject to the vendor's right to take the wool, or to his obligation to furnish pasturage, or to his duty to weigh them. And difficulties arise in determining such questions, not only because parties fail to manifest their intentions, but because not uncommonly they have no definite intentions; because they have not thought of the subject. When there has been no manifestation of intention, the presumption of law is that the contract is an actual sale, if the specific thing is agreed on, and it is ready for immediate delivery, but that the contract is only executory when the goods have not been specified, or if, when specified, something remains to be done to them by the vendor, either to put them into a deliverable shape, or to ascertain the price. In the former case there is no reason for imputing to the parties any intention to suspend the transfer of the property, inasmuch as the thing and the price have been mutually assented to, and nothing remains to be done. In the latter case, where something is to be done to the goods, it is presumed that they intended to make the transfer of the property dependent upon the performance of the things yet to be done, as a condition precedent. Of course, these presumptions yield to proof of a contrary intent, and it must be repeated that nothing prevents the parties from agreeing that the property in a specific thing sold and ready for delivery is not to pass till certain conditions are accomplished, or that the property shall pass in a thing which remains in the vendor's possession, and is not ready for delivery, as an unfinished ship, or which has not yet been weighed or measured, as a cargo of corn, in bulk sold at a certain price per pound, or per bushel."

On the question now under consideration, the first point relied upon by appellant is that, when the terms of a contract for the exchange of specific personal property are agreed upon, the bargain struck, and everything the seller has to do with the goods is complete, the contract of exchange becomes absolute as between the parties thereto without actual payment or delivery, and the risk of accident to the goods vests in the buyer. As will be seen, appellant's statement of the rule is not far from correct. New Mexico being one of the few states that have not adopted the Uniform Sales Act,

we must look to the common law for the rule to be applied. When we do so, we find little, if any, disagreement as to the correct statement of the rule. As Mr. Benjamin has said in the language already quoted, the question is largely one of intention of the parties, and is one of fact rather than of law, unless the intention has been clearly expressed, which is not the case here.

In appellants' discussion of this point, they assume that the goats contracted to be exchanged for the cattle were specific, although as already pointed out herein, these particular goats were intermingled with the goats of other owners, and were being run and managed by one Boyles, who also had goats in the general flock. For the moment, however, we shall also assume that the property was specific, for the purpose of discussing the application of the rule now contended for by appellant.

For our guidance in arriving at a correct solution of the problem, the common law furnishes the following rules:

(1)   Generally, where a bargain is made for the purchase of goods and nothing is said about payment or delivery, the property passes immediately so as to cast upon the purchaser all future risk if nothing remains to be done to the goods, although he cannot take them away without paying the price. Simmons v. Swift, 5 B. & C. 862; Dickinson v. Yates, 5 Ad. & El. 313 and 340; Tarling v. Baxter, 6 B. & C. 360; Gilmour v. Suptle, 11 Moore, P. C. 566.

(2)   Where, by the agreement, the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is to be bound to accept them, or, as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting of the property. Blackburn on Sales, 151, 152; Benjamin on Sales, 221.

(3)   Where anything remains to be done to the goods for the purpose of ascertaining the price, as by weighing, measuring, or testing the goods, where the price is to depend on the quantity or quality of the goods, the performance of these things, also, shall be a condition precedent to the transfer of the property, although the individual goods be ascertained and they are in the state in which they ought to be accpeted. Blackburn on Sales, 151, 152; Benjamin on Sales, 221.

(4)  Where the buyer is by the contract bound to do anything as a condition, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer.  Benjamin on Sales, 222.

Still, assuming that the goats covered by the contract were specific, it remains to examine the facts in connection with the rules stated for the purpose of determining the intention of the contracting parties with reference to the time when the property should pass from the defendants to the plaintiff.   No specific finding on the question of this intention was made by the court, nor was any requested by either party. However, as has been seen already, the court did find that it was agreed that after the cattle were delivered the plaintiff was at liberty to return to his home and move his family to Prescott, Ariz., and then return to defendants' ranch and receive the goats.   While the understanding that plaintiff was not to take the goats away until after he should have returned from Arizona would not be conclusive as to an intention with reference to when the title should pass, yet it certainly is evidence tending to point to an intention that title should pass at that time.   It was also agreed that the goats should be sheared before delivery to the plaintiff, said Boyles having an interest in the mohair, so that we have no difficulty in determining that it was the intention of the parties that the title should not pass until at least after the shearing.   Furthermore, these goats being intermingled with other goats, and said Boyles having an interest in the increase thereof, so that a division of the kids was necessary before plaintiff in this case could take possession of them, it was necessary not only that the goats be sheared, but that there be a separation and division.   It is contended that this was done about the 15th of September, which was some time before the goats were lost; but it seems that such separation and division were made altogether by Boyles at the time he sheared, and it is very questionable if the goats were not divided into two bunches more for convenience in shearing than for any

other purpose. At any rate, the goats were all thrown back together after the shearing, and we find plaintiff strongly disputing any agreement between him and defendants by which Boyles was authorized to act for the parties in segregating defendants' goats for delivery to plaintiff. It also appears at the time the goats were to be delivered to plaintiff there was to be a balancing of accounts by the payment in cash of any difference between the parties in property valuations, based upon the prices fixed in the contract, and one of the defendants himself testified as follows:

"Q. Was it stated then, in that conversation in which you said that Jones was to send after you when he came over there to get the goats? A. I intended to state that we was to get together and have a settlement.

"Q. After the delivery of the goats? A. No; when those parties had delivered the stuff we was to either be there or get together and get their figures and have a settlement in order to know which way the money end of it went."

It is plain, therefore, that a number of things were to be done before plaintiff was to take possession of the goats, among them being a count for the purpose of ascertaining the value thereof for the purpose of the exchange. It seems that this count was to be made after the cattle were delivered, when both parties were together, in order that a settlment might be arrived at. Applying the rules above enumerated, it would seem that the court below was justified in holding, as he must have held in order to give judgment for the plaintiff, that it was the intention of the parties that the title in the goats should not pass until after plaintiff had returned from Prescott, Ariz., and he and the defendants got together for the purpose of making a complete settlement.

The next point made by appellant in connection with discussion is that, when appellants caused Boyles to shear, segregate, and count to goats for the purpose of delivery to the appellee without reserving the right of disposal, the goats thereupon became unconditionally appropriated to the contract, and the con-

tract thereupon became executed, and the loss of the goats became the loss of the appellee. This argument assumes that the goats, by reason of their being intermingled with other goats, were not specific property within the meaning of the foregoing rules, and seeks to apply the well-known rule that after an executory contract has been made it may be converted into a complete bargain and sale by specifying the goods to which the contract is to attach; that is, by the appropriation of specific goods to the contract. Defendants, however, have not stated the rule in its entirety, in that it omits the essential element of assent by the plaintiff to the appropriation. In the case of Campbell v. Mersey Docks & Harbour Board, 14 C. B. (N. S.) 412, Chief Justice Erle said that it had been established by a long series of cases that the purchaser of an unascertained portion of a larger bulk acquires no property in any part until there has been a separation and an appropriation assented to both by the vendor and vendee, and that nothing passes until there is an assent, express or implied, on the part of the vendee. While the evidence is conflicting as to whether or not the parties agreed that Boyles should segregate and count the goats ready for delivery, it is significant that the court refused to find that he was so authorized and there is substantial evidence, including the testimony of one of the defendants above quoted, to the contrary.

So, the parties having failed to clearly express their agreement as to when title in the goats should pass, if they ever had any such agreement, and the evidence being conflicting, although so extremely close that it might have justified a finding either way, it is suggested that, on another trial, the court consider the evidence in the light of the foregoing rules, to the end that the intention of the parties may be determined, as nearly as may be.

For the reasons stated, the judgment of the lower

court should be reversed, and the cause remanded for a new trial; and it is so ordered.

PARKER, C. J., and BRATTON, J., concur.