**270 P.2d 727**

**STATE v. WHITE.**

**No. 5724.**

Supreme Court of New Mexico.

May 12, 1954.

W. T. O'Sullivan, Robert L. White, Heister H. Drum, Albuquerque, N. M., for appellant.

Richard H. Robinson, Atty. Gen., Fred M. Standley, Asst. Atty. Gen., Walter R. Kegel, Asst. Atty. Gen., for appellee.

SEYMOUR, Justice.

Defendant appeals from judgment and sentence of the District Court of Bernalillo County pursuant to verdict of a jury finding defendant guilty of murder in the second degree.

The factual details are of little consequence for purposes of this decision. Briefly, they are: Defendant and one Aimee Bono met in Chicago in 1943. Aimee Bono was of Chinese ancestry and, by reason thereof, was in danger of deportation. For this or other reasons, defendant married her in 1947. They lived in various parts of the country before moving to Santa Fe, New Mexico. In Santa Fe, the deceased Aimee Bono White was employed as a secretary by one Wynn H. Hickam, agent for an insurance company. The relationship between Aimee Bono White and her employer increased in intimacy to the point that the defendant was threatening the lives of both his wife and her employer, and the deceased, in turn, was asking her husband, the defendant, for a divorce in order that she might marry Wynn Hickam. This situation culminated in the following series of events: On the 19th day of January, 1953, the deceased ran away from her home and went to San Francisco; after a frantic search by the defendant; her whereabouts, already known to Hickam, was discovered by defendant, and deceased was persuaded to return home; in the process of return, while her husband was trying to meet her in Albuquerque, Hickam took her from the train in Gallup, New Mexico, and brought her by car to the Zia Lodge in Albuquerque. From there, deceased telephoned defendant in Santa Fe on January 26, 1953. Defendant purchased a gun under an assumed name, borrowed a car, went to Albuquerque and, after some conversation which concluded with deceased's spitting in the face of defendant, he shot her five times, killing her. Later that night, through friends, he turned himself over to the police.

At the commencement of trial, over objection by the state, defendant changed his plea from "not guilty" to "not guilty by reason of an insane state existing at the time of the offense in question."

Three points are relied upon for reversal. As stated in appellant's brief, the first is:

"Point one

"The present rule in this jurisdiction respecting the defense of insanity in criminal cases always presupposes substantial evidence of a diseased mind

in the first instance, plus substantial evidence

"1. That such diseased mind rendered the accused incapable of knowing the nature and quality of his act; or

"2. That such diseased mind rendered the accused incapable of distinguishing between right and wrong; or

"3. That such diseased mind rendered the accused incapable of exercising the normal governing power of the will so as to control his actions under the compulsion of an insane impulse to act."

There is no difference of opinion as to the present rule in this jurisdiction insofar as it is stated in appellant's point one through Arabic numerals 1 and 2. A serious question is raised as to that phase of the so-called defense of insanity expressed under Arabic numeral 3. It is the contention of the state that the ultimate and final test of the defense of insanity in criminal cases lies in the answer to the question of whether or not the defendant, by reason of a diseased mind, was rendered incapable of distinguishing between right and wrong. In support of this contention, the state relies upon State v. Roy, 1936, 40 N.M. 397, 60 P.2d 646, 110 A.L.R. 1, and State v. Moore, 1938, 42 N.M. 135, 76 P.2d 19. There is certainly language in both of these decisions to sustain this position:

"We have not departed from the 'right and wrong test' as established in the famous McNaughten Case, 10 Clark & F. 199, 8 Eng. Reprint, 718, which is the generally accepted doctrine of the English and American courts. The capacity of the accused to distinguish right from wrong in respect to the act charged as a crime at the time of its commission is made the test of his responsibility." State v. Roy, supra [40 N.M. 397, 60 P.2d 650.]

"Without going into an academic, physiological, and psychological discussion as to the difference between the irresistible impulse rule and the 'right and wrong test' rule as applicable to criminal guilt, we merely reassert our adherence to the rule enunciated by this court in the case of State v. Roy * * * where we said: 'The capacity of the accused to distinguish right from wrong in respect to the act charged as a crime at the time of its commission is made the test of his responsibility.'" State v. Moore, supra [42 N.M. 135, 76 P.2d 24.]

On the other hand, appellant contends for an extension of the M'Naghten Rules, "by the addition of a third limb to meet the case of insanity affecting not the reason but the will." The extension sought by the

appellant is that recommended by the British Medical Association "to cover cases where the accused 'was labouring as a result of disease of the mind, under * * * a disorder of emotion such that, while appreciating the nature and quality of the act, and that it was wrong, he did not possess sufficient power to prevent himself from committing it.' " Royal Commission on Capital Punishment, 1949–1953 Report, p. 104. Appellant finds support for this so-called extension of the defense of insanity in criminal cases in Territory v. Kennedy, 1910, 15 N.M. 556, 110 P. 854; State v. Folk, 1952, 56 N.M. 583, 247 P.2d 165, and in considerable of the language of the decision in State v. Moore, supra. Without discussing our reasons therefor, in our judgment the Kennedy case and the Folk case are not helpful. On the other hand, the language in the Moore case, which so bluntly holds that the right and wrong test is the law of New Mexico, certainly states and apparently approves of the extension contended for by appellant. The language referred to appears at pages 158 and 159 of 42 N.M., 76 P.2d 19. We find ourselves as pointed out in appellant's brief, in a position of doubt as to the conclusion already reached in the case law of New Mexico. This confusion has resulted in text writers' citing New Mexico cases on both sides of the controversial argument. In this connection, it is interesting to note that the attorney general, in his brief, recommends a reconsideration of the decisions of this Court at an appropriate time to determine whether or not the rules regarding insanity as a defense to crime should be broadened to include the so-called irresistible impulse theory. In fairness to him, he further contends that this is not an appropriate time.

The legal question is posed to this Court as a result of instruction numbered eighteen given by the court, which aimed at, but failed to state properly, this theory propounded by appellant, and by defendant's requested instruction numbered three which was refused by the trial court and which appellant contends correctly states the theory. There is no need to quote or discuss that portion of instruction eighteen given by the court and intended to cover this idea. It is admittedly defective and this was called to the trial court's attention. However under our rules stated at Secs. 19–101 rule 51(g) and 42–1117, 1941 Comp., as interpreted in State v. Compton, 1953, 57 N.M. 227, 257 P.2d 915, in order for appellant to preserve the trial court's error for review, it is necessary that he submit a proper instruction. Defendant's requested instruction number three, refused by the trial court, reads as follows:

"If the defendant, at the time he committed the act with which he is charged here, was conscious of the act he was committing and knew its consequences but nevertheless, by rea-

son of a diseased mind, was so wrought up as to be deprived of the normal governing power of the will and, in consequence thereof, was incapable of controlling his actions, then you will in that case acquit him."

There are two questions: Should this Court adopt an extension of the M'-Naghten Rule? And, if so, does the requested instruction of appellant properly state the law of such an extension?

Our conclusions as to these two questions are that the extension should be made and that defendant's requested instruction does not properly state the law.

We again quote the formula proposed by the British Medical Association, namely, that a successful defense of insanity is established where it is shown that the accused "was labouring, as a result of disease of the mind, under * * * a disorder of emotion such that, while appreciating the nature and quality of the act, and that it was wrong, he did not possess sufficient power to prevent himself from committing it." Appellant's requested instruction numbered three, relying on the Kennedy case and upon the words, "a disorder of emotion" used in the Medical Association formula, reads in part as follows: "* * * by reason of a diseased mind, was so wrought up as to be deprived of the normal governing power of the will

* * *" In the quoted part of the requested instruction, there are two ideas which this Court specifically refuses to acknowledge with approval. The first is the concept injected into the requested instruction by the words, "so wrought up." The only further rule of law as to the defense of insanity which this Court is willing to adopt is as follows: Assuming defendant's knowledge of the nature and quality of his act and his knowledge that the act is wrong, if, by reason of disease of the mind, defendant has been deprived of or lost the power of his will which would enable him to prevent himself from doing the act, then he cannot be found guilty. We do not believe that the idea of excitement or impulsive action has any place in such an instruction. As stated by one writer, insanity takes the form of the personality of the individual and, if his tendency is toward depression, his wrongful act may come at the conclusion of a period of complete lethargy, thoroughly devoid of excitement. That this idea is not exclusively ours can be seen by reading further in the Report of the Royal Commission on Capital Punishment cited above, where we find the following statement at page 110:

"We feel, however, that in the formula suggested by the Association the distinction drawn between 'defect of reason' and 'disorder of emotion', though it may have its place in the evidence of a medical witness or in a

Judge's summing-up is not suitable for inclusion in the formula itself."

Further along this same line, the insanity of which we speak does not comprehend an insanity which occurs at a crisis and dissipates thereafter. The insanity of which we speak is a true disease of the mind, normally extending over a considerable period of time, as distinguished from a sort of momentary insanity arising from the pressure of circumstances.

The second error in appellant's proposed instruction appears in the words, "the normal governing power of the will." The will power of any number of individuals will differ among them from the strongest to the weakest, depending upon all of the hereditary and environmental influences which necessarily bear upon the development of each human being. We do not believe that any test of "ordinary" will power or "reasonable" will power can be used in such a case. Whether or not a defendant had the "normal governing power of the will" is beside the point; the only question for determination is whether disease deprived the defendant of whatever will power he happened to have. Therefore, as to point one relied upon for reversal, our conclusions are as follows: (a) That the limited extension described above to the M'Naghten Rules of the defense of insanity in criminal cases should be made. (b) That the defendant's tendered instruc-

tion on the law comprehended by such extension was erroneous; that, by reason of appellant's failure to offer a proper instruction, the error of the trial court is not available to appellant.

For the purpose of clarifying the rule of law applicable to the defense of insanity in criminal cases in this jurisdiction, we state it to be as follows: " 'The jury must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind * * * (a) did not know the nature and quality of the act or (b) did not know that it was wrong or (c) was incapable of preventing himself from committing it.' " Royal Commission on Capital Punishment, p. 111, supra. Parsons v. State, 1887, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193, contains an excellent and thorough discussion of the principles underlying this rule.

The second point relied upon by appellant for reversal raises a most difficult question. The point is stated as follows:

"Point two

"The hostility of a witness to the defendant may be proved by any competent evidence, and the exclusion of two defense witnesses called for such purpose, after proper tender of such proof to be made through such witnesses, was prejudicial error under the circumstances."

We quote in full the tender made by appellant's counsel and the court's ruling thereon:

"Mr. O'Sullivan: (addressing the Court) By this witness, I intend to prove the hostility of the last witness called by the State, Wynn Hickam. Such hostility being directed toward the defendant, Allen White, as expressed by Wynn Hickam to this witness, Miss Sorenson, as to which I have expressly questioned Mr. Hickam while he was on the stand. There were statements during which he referred to Mr. White, the defendant, as 'that old bastard' on two separate occasions. Then, I have an additional matter that I would like to offer: the attempt by Wynn Hickam to keep this witness off the stand in this case by his threats directed to her. He told us that he had made no threats at any time for the purpose of keeping her away from this Courtroom—I have a witness * * *

"The Court: Your tender of proof as to any action of Mr. Hickam to keep this witness off this stand, is denied and refused. My notes on your cross examination of Wynn Hickam, as to hostilities referred to this witness, indicate that you were more interested in Mr. Hickam's relations with women, than you were with the hostility of Mr. Hickam towards the defendant. You asked him something about 'living with over a thousand women, but never an oriental. Can you imagine that beautiful girl living with that old bastard' —that is not evidence of hostility and the Court will exclude it.

"Mr. O'Sullivan: I make tender of proof at this time, by the testimony of Lynn Sorenson, which I now offer, that Wynn Hickam between the 2d and the 6th of April, of this month, spoke to this witness and told her that she better stay away from this Court, if she knows what's good for her. That he would 'drive her out of town and out of business and prove that she is a common whore' to use his language, and that he would produce men to establish those facts if necessary, even if he had to pay them. That is the efforts he made to keep her away from Court. The second thing I will offer as evidence of hostility, to be judged by the Jury as to whether his language should be so interpreted as against the defendant, White, in his statement to the witness that 'after she—that is, Aimee White—had some of my stuff, she didn't want any more of that old bastard.' And, again, on the day that Wynn Hickam interviewed and hired Aimee White as a secretary, according to testimony on November 3, 1952, he told Lynn Sorenson specifically:

'I have had over a thousand women, but never an Oriental. Imagine her with her French complexion, her Oriental features, and her British accent, living with that old bastard!' Now, on the last point, I wish to offer proof that on the very night that Aimee White died—this is in direct impeachment of testimony of Hickam—he called Lynn Sorenson at her home and asked her to meet him and they would be married in fifteen minutes. This, at a time that he did not know that Aimee White was dead!

"The Court: I will deny tender of proof on all points of this witness. Call Dixie Colbert. Mr. O'Sullivan, make tender of proof of what you intend to prove by this witness.

"Mr. O'Sullivan: I offer the proof of hostility similar to that which I made the tender of with respect to Lynn Sorenson. I offer to show by this witness that on the morning of Saturday, the 24th of January, 1953, in direct contradiction to the testimony of Wynn Hickam, he went to the cafe next door to his place of business in Santa Fe, this witness being employed there, and invited her to accompany him in his car to Gallup, New Mexico, and to spend Saturday night there with him, prior to his meeting the train with Aimee White on it the next morning, and he offered to pay her fare back to Santa Fe, if she were to go—all this, in direct contradiction of his testimony.

"The Court: Your tender of proof is of a contradictory matter. How do you reason hostilities toward the defendant out of that accounting? I will exclude the tender.

"Mr. O'Sullivan: The next point, with respect to his efforts to keep her away from Court. He was not interested in a successful prosecution of the witnesses in coming here to tell what they know about the case. Neither witness has shown any knowledge of any material facts in this case; we do not believe they have any knowledge concerning the actual killing, but we believe that Mr. Hickam did not know whether they had any such knowledge and yet Mr. Hickam was using his best efforts to prevent these witnesses, with or without knowledge, from coming here and we think that the efforts on the part of Mr. Hickam to prevent people from testifying, even though they may have no knowledge, shows a prejudice and a hostility toward the defendant.

"The Court: I will exclude the tender of testimony from Dixie Colbert (Colevart?)."

The state has three theories on which it seeks to sustain the trial court's ruling of

exclusion: (1) That the matters offered were collateral and, therefore, independent testimony for the purpose of impeachment was improper. (2) That, by withdrawing a plea of not guilty and substituting a plea of guilty by reason of insanity, the only issue in the case was insanity, an issue on which Hickam gave no testimony; therefore, the state argues that the impeachment was utterly irrelevant. (3) That defendant was not prejudiced by the exclusion since the purpose was to attack the witness Hickam's testimony as to deliberation; that, since defendant was convicted only of second degree murder, the question of deliberation incident to first degree murder went out of the case.

The reversal for technical reasons of a jury's verdict of guilty in serious crimes of this nature is repugnant to this Court. Nevertheless, it is our duty to see that the substantial rights of an accused are given to him.

■ As to the state's first theory, there are numerous cases in this jurisdiction on like questions. However, for the purpose of decision here, we cannot escape the statements made by Judge Bratton in State v. Newman, 1923, 29 N.M. 106, 219 P. 794, citing an earlier decision of this Court, State v. Kile, 1923, 29 N.M. 55, 218 P. 347, which statements follow an almost universal rule of law. That rule is that "testimony discrediting a witness as to bias and interest is never excluded on the ground of being collateral." Wigmore on Evidence, 3d Ed., Vol. 3, p. 697, § 1022; Wharton's Criminal Evidence, 11th Ed., Vol. 3, p. 2226, § 1346; p. 2235, § 1354. A part of the tender in this case covers a specific effort on the part of the prosecuting witness Hickam to keep certain possible witnesses from appearing at the trial. Regardless of what we believe to have been the motivation for Hickam's action in this regard, assuming it to be a fact, we find no cases in the books in which such efforts on the part of a witness are properly excluded when offered to prove bias or interest. Cases of a similar character are cited in § 1349, p. 2230, Wharton's Criminal Evidence, supra.

■ The second theory upon which the state sought to sustain the exclusion of this testimony is unsound; Territory v. Kennedy, supra, was a case similar to the instant case; the only defense was insanity; the trial court was reversed on the ground that no verdict of "not guilty" was submitted to the jury; in view of this decision, it is impossible to say that, in the instant case, the only issue before the jury was the issue of insanity. Further, the state, under its second theory, overlooks the fact that if Hickam's testimony is relevant to the case in any respect, it is proper by independent evidence to show his bias or interest. This last statement is equally ap-

plicable to the state's third theory, in which we find no merit.

■ By reason of the erroneous exclusion of that portion of the tender last discussed, it becomes necessary to reverse the trial court and order a new trial; this conclusion further makes unnecessary the consideration in detail of the other elements of the tender; however the rule of law discussed above is equally applicable to testimony offered for the purpose of showing hostility on the part of the witness; it cannot be excluded on the theory that it is collateral; whether or not, under all the circumstances, Hickam's characterization of the defendant as an "old bastard" is evidence of hostility, is a close question.

At this point, it seems appropriate to acknowledge the dissenting opinion filed by Justice Sadler. The majority feels no less strongly than he concerning this Court's responsibility in the reversal of this judgment.

The state makes no contention along the lines suggested by Justice Sadler, that is, that there was no proper tender of the excluded testimony. The reason for this appears in the record. A careful foundation was laid by defense counsel on cross examination of the witness Hickam for the subsequent attack upon him through the offered testimony of Lynn Sorenson and Dixie Colbert. Immediately after the state rested its case and the defense witnesses, including these two, were sworn, the following exchange took place:

"Mr. O'Sullivan: Lynn Sorenson, take the stand please.

"Mr. Tackett: If the Court please, before going into the testimony of this witness, the State requests that Mr. O'Sullivan make tender of proof regarding what he intends to prove by this witness—in the absence of the Jury.

"The Court: Yes, I think that is a reasonable request. (addressing the jury) Ladies and Gentlemen of the Jury, you are requested to retire for a few minutes.

(the Jury retired to the Jury Room)" Defense attorney then made the tender in question.

■ Thus it appears that the defense called this witness to the stand; before the witness could be asked even her name, the district attorney requested that defense attorney reveal what information he would seek to elicit from the witness by his questions. The trial judge demanded that defense attorney make a tender of what he proposed to show. Under these circumstances, with the prosecution and the trial judge effectually preventing defense attorney from asking any questions, the prosecution could not be heard to urge here the failure of the defense to ask a proper

question calling for the testimony covered by the tender. If the state could not urge this ground for sustaining the erroneous exclusion by the trial court, it does not seem proper for this Court to do so on behalf of the state. As stated by this Court in Dollarhide v. Gunstream, 1951, 55 N.M. 353, 233 P.2d 1042, 1043: "Errors of the trial court cease to be such in the appellate court if invited or waived."

■ Finally in this regard, none of the cases cited by the dissenting opinion pass upon the point made by that opinion. The basic reason underlying the rule of tender is directed at insuring exact knowledge on the part of the trial court of the evidentiary facts which he is called upon to admit into or exclude from consideration.

This knowledge the trial court had in the instant case. To deprive this defendant of what we conceive to be a substantial right on the most technical interpretation of this rule of tender, when the purpose of that rule has been served, encroaches too deeply upon the fundamental rights of every accused, which rights our system of law protects so jealously. We find further support for this view in the recent case of State v. Clarkson, 1954, 58 N.M. 56, 265 P.2d 670.

■ Our disposition of the preceding point makes it unnecessary to consider the last point relied upon for reversal and stated by appellant as follows:

"Point three

"It is an abuse of discretion for a trial judge to interrupt a jury's deliberations after only three and one-half hours so that he may, of his own motion, give the jury a supplemental instruction—the so-called 'shotgun charge'—in a murder trial which had lasted for four days and in which a total of twenty-six witnesses and thirty-five exhibits had been introduced in the course of the trial."

We shall say, however, that while the appropriateness of a "shotgun" instruction is largely within the discretion of the trial court, certainly the greatest caution should be exercised in avoiding an abuse of that discretion. Being a discretionary matter and decision on the point not being required for the disposition of this case, we shall not lay down any hard and fast rule attempting to control such discretion.

The judgment of the lower court is reversed and the cause remanded for a new trial.

It is so ordered.

McGHEE, C. J., and LUJAN, J., concur.

COMPTON, Justice (concurring specially).

I concur in the result but feel constrained to dissent from the legal doctrine an-

nounced, the so-called extension of the rule of the M'Naghten case as a defense in criminal cases. In this regard, I concur in the dissenting opinion of Justice Sadler.

SADLER, Justice, (dissenting).

The trial court committed no error in rejecting the tender, not because the judge presiding gave a good reason therefor, but for another good and sufficient reason not stated, namely, because counsel for the defendant did not lay the proper predicate for the tender before making his offer of proof.

There are three essential steps to be taken in making a proper tender, each of which must be complied with before advantage may be taken of the trial court's action in rejecting the tender. They are as follows:

(1) Production of the witness on the stand.

(2) The framing and putting to the witness of a proper question designed to elicit the testimony sought to be introduced.

(3) The sustaining of an objection to an answer by the witness.

When these three conditions to making the offer of proof have been met, then and only then is it timely for the defendant, if he be the one desiring to introduce the testimony, to make his offer of proof. This has been the rule in New Mexico for so long that it is not open to question. See State v. McCracken, 22 N.M. 588, 166 P. 1174; State v. Anderson, 24 N.M. 360, 174 P. 215; State v. Ulmer, 37 N.M. 222, 20 P.2d 934. In State v. McCracken, supra, in paragraph 2 of the syllabus prepared by the court, we said:

"As a general rule, in order to reserve an available objection to the exclusion of evidence, *a proper question must be asked,* and, on objection thereto, an offer must be made at the time, showing what evidence will be given if the witness is permitted to answer, the purpose and object of the testimony sought to be introduced, and all the facts necessary to establish its admissibility." (Emphasis added.)

Likewise, in State v. Anderson, supra, in paragraph 5 of the syllabus prepared by the court, we said:

"As a general rule, in order to reserve an available objection to exclusion of evidence, *proper question must be asked, and, on sustaining objection thereto, an offer must be made, showing what evidence will be given if witness is permitted to answer,* the purpose and object of testimony sought to be introduced, and facts necessary to establish its admissibility." (Emphasis added.)

Now, how many of these conditions did defendant comply with in the present case before making his offer of proof? Exactly one. No more. He produced his wit-

nesses on the stand, then by-passed conditions 2 and 3 and made his offer of proof. Not a single question was ever put to either witness produced—an obvious disregard of requirement No. 2. Nor was an objection interposed to any question asked because none was asked. I am willing to admit counsel for defendant in making his offer of proof may have thought it would be presupposed that conditions 2 and 3 had been met, and going even further with the fiction, that the district attorney as well as the trial judge moved along as if they had.

However, all this seems beside the point. The accused was on trial for a brutal slaying of his wife. He was represented by one of the most experienced and successful criminal trial lawyers in the state. He was convicted of second degree murder and given what is the equivalent of a life sentence for the slaying. The defendant was fortunate in escaping a verdict of first degree carrying the extreme penalty. It is not a case warranting indulgence of fictional suppositions of compliance by a defendant with the two conditions mentioned as a predicate to reversal and award of a new trial. The result is that the trial judge made a correct ruling but gave a wrong reason for it. We may not properly set aside his ruling on that ground. Lockhart v. Wills, 9 N.M. 344, 54 P. 336; Thomas v. Gavin, 15 N.M. 660, 110 P. 841; Jones v. Jernigan, 29 N.M. 399, 223 P.

100; Wiggs v. City of Albuquerque, 57 N.M. 770, 263 P.2d 963.

Compliance with these traditional conditions as a predicate to the making of a proper tender are supported by good reason and logic. Take what actually transpired here as an illustration. Much of the tender was of an omnibus nature, *en masse,* some admissible and some inadmissible. It may be granted that enough was said by the court at the time to disclose he was directing his ruling primarily to that portion of the tendered testimony as would show bias or interest; nevertheless, it was joined with a lot of other testimony embraced in the order of exclusion that had no bearing whatever on the question of bias or interest on Hickam's part and was properly excluded on that account. But unless questions be put to the witness occupying the stand and a tender made of exactly what counsel intends to prove in response to the questions asked, it is easily to be seen what difficulty is to be met with in screening the admissible from the inadmissible portion of the testimony of each witness. It is thus but a requirement of orderly trial practice that these steps be taken in numerical sequence to the end that the bad may be screened from the good, the inadmissible from the admissible, by appropriate objection as each question is asked.

Still another reason supports the rule that each of these steps must be taken in

sequential order. It is to be remembered that all these proceedings in reference to the tender occurred out of the presence of the jury. The matter of tendered testimony —unless compliance with the conditions mentioned be insisted upon—can become pretty dangerous. There may be times when the trial judge will have reason to doubt the good faith of the party making the tender. If the witnesses be not interrogated, counsel so disposed (and there is no intention to relate this supposition to present counsel) can put words without limit in the form of tendered testimony in the mouth of the witness sitting mute on the stand.

Thus a witness who has not exposed himself to the pains of perjury, because never having a question asked him, has become a pseudo witness in the case, nevertheless, by reason of his supposed testimony. The trial judge, however, may wish to test the good faith of the tender by permitting the witness to answer. He can still keep it from the jury if he deems it inadmissible. But to the extent, if any, the answers of the witness may not live up to the offer of proof, the judge has protected his record from possible reversal and, at the same time, has denied defendant the benefit of a tender of false testimony, the truth of which otherwise would have been assumed. However, if the witness may sit mute on the stand, throughout, as in the present case,

this means of testing good faith could never be availed of.

Undoubtedly, if the witnesses here involved had not been produced and put on the stand, yet everything else shown in the record as having transpired had actually taken place, the failure of the court or of the district attorney to object to the tender because of the absence of the witnesses would not deter us from sustaining the trial court's action in rejecting the tendered testimony. There is just as much reason for sustaining its action in the present case when the sole reason for having the witnesses present is not availed of—namely, for addressing proper questions to them. For all practical purposes, if the majority opinion is to stand, these witnesses might just as well have remained in Santa Fe while the tender of what they would testify was being made in Albuquerque; or, with as much notice or effect as was attached to their presence, they could as easily have been represented by proxy.

The majority seem satisfied to translate the colloquy between court and counsel at the time of the supposed tender as presenting a case of invited error as to this claimed error because after excusing the jury the trial judge acquiesced in a request by the district attorney that defendant's attorney proceed in a statement of what he proposed to prove, apparently without interrogating the witness. This he might as

well have done in the absence of the witness. Defendant was represented by able counsel who presumably knew how to make a proper tender and as well how to preserve the error if (and I do not so appraise the record) the trial court or the prosecution were denying him the right to present his tender in the proper way, viz., by interrogation of the witness.

The tender was properly rejected because no proper predicate had been laid for making it. There is nothing in the facts shown by the record before us that moves me to favor any relaxation of the rule in defendant's favor, even if it were permissible to do so. So much for the question of the tender's sufficiency.

I disagree, also, with the majority opinion in so far as it announces an extension of the test so long obtaining in this jurisdiction for determining whether a defendant charged with crime was insane at the time of trial, or when he committed the alleged offense—the so-called "right and wrong" test. In State v. Roy, 40 N.M. 397, 60 P.2d 646, 650, 110 A.L.R. 1, we defined the rule as follows:

"The capacity of the accused to distinguish right from wrong in respect to the act charged as a crime at the time of its commission is made the test of his responsibility."

See, also, State v. Nevares, 36 N.M. 41, 7 P.2d 933, and State v. Moore, 42 N.M. 135, 76 P.2d 19.

It impresses me that in the so-called extension of the rule of the M'Naghten case, 10 Clark & F. 199, 8 Eng. Reprint, 718, adopted by the majority, they have for all practical purposes embraced the doctrine of "irresistable impulse" as a defense in criminal cases. It is my candid belief that the effort on the part of trial courts to instruct properly on the test in the light of today's extension thereof, more especially in attempting to differentiate between it and the generally repudiated doctrine of "irresistible impulse" as a defense in criminal trials, will result in many reversals before the law becomes well enough understood to avoid them. In my humble opinion, the majority, themselves, do not differentiate so clearly between the extension approved and the doctrine of "irresistible impulse."

Thus it is that I disagree with the majority opinion for two reasons:

(1) Because the tender relied upon for reversal was properly rejected in that the witnesses were not interrogated, making the trial court's ruling correct even though it gave a wrong reason therefor.

(2) Because the prevailing opinion expands the field for offering insanity as a defense to crime beyond the traditional

test long employed by this Court, both before and since statehood.

It follows from what has been said that in my opinion the judgment should be affirmed. The majority ruling otherwise,

I dissent.