## BALDWIN *v.* STATE.

## Opinion delivered July 5, 1915.

1. APPEAL AND ERROR—VERDICT OF JURY—CONCLUSIVENESS ON APPEAL.—Where the record contains evidence which is legally sufficient to sustain a verdict, the verdict will not be disturbed on appeal, unless it appears that errors of law have occurred which may have operated to the prejudice of the losing party.

2. CRIMINAL LAW—CONTINUANCES.—Where defendants were arrested on March 12, 1915, and lodged in jail, being indicted on March 29, 1915, the trial court will not be held to have abused its discretion, in refusing to grant defendants a postponement, when their cases were called for trial on April 1, 1915.

3. CONTINUANCES—ABSENT WITNESSES—DISCRETION OF COURT.—Where a continuance for five days was asked, in a criminal prosecution on account of absent witnesses, where the testimony sought to be introduced was merely cumulative, the trial court will not be held to have committed error in refusing it.

4. TRIAL—CROSS-EXAMINATION—DISCRETION OF COURT.—The extent of cross-examination of a witness is in some measure within the control and discretion of the trial court; it is the duty of the trial judge to see that it is not unduly prolonged, nor that useless and immaterial questions are asked, nor that questions relating to undisputed matters are repeated.

5. EVIDENCE—OPINION TESTIMONY—ADMISSIBILITY.—In a prosecution for a bank robbery, it was not improper for the court to refuse to permit the answering of the question, "In that country is fifteen or twenty miles regarded as a great distance?" The same calling merely for the opinion of the witness on a matter which could be shown by more direct and definite statements of fact.

6. EVIDENCE—CHARACTER OF DEFENDANT—CRIMINAL PROSECUTION.—In a prosecution of defendant for the crime of bank robbery, it was proper to exclude the following question asked by defendant's counsel on the issue of defendant's reputation and character, "Has there been anything in his conduct as a peaceable, law-abiding man, that has caused it to be discussed?"

7. APPEAL AND ERROR—EXCLUSION OF TESTIMONY—PREJUDICE, SHOWN HOW.—Counsel for appellant asked witness a certain question, which the court refused to permit him to answer, and counsel excepted to the ruling of the court assigning it as prejudicial error. *Held*, it not appearing from the record what the appellant expected the answer of the witness to be, that the prejudicial effect of the ruling of the court was not shown.

8. APPEAL AND ERROR—EVIDENCE—IMPROPER QUESTION—NEGATIVE AN-
SWER.—In a criminal prosecution, the court permitted the prosecu-
tion to recall a witness, and to ask him if he had not stated certain
things with reference to the identity of the accused and the person
committing the crime; *held*, there was no prejudice in asking the
question, when the witness answered it in the negative.

9. TRIAL—IMPROPER ARGUMENT—REMOVAL OF PREJUDICE.—The prejudice
arising from improper argument and remarks of counsel may be
removed by a proper admonition by the court to the jury.

10. CRIMINAL LAW—MOTION FOR NEW TRIAL—RIGHT OF DEFENDANT TO AT-
TEND HEARING.—The provisions of the Constitution and the statutes,
relating to the right of the accused to be present at all stages of
his trial, relate merely to the trial itself, and as a trial ends with
the verdict of the jury, there is no denial of the constitutional or
statutory right in hearing and considering the motion for a new
trial in the absence of the defendant himself.

Appeal from Sevier Circuit Court; *Jefferson T. Cow-
ling,* Judge; affirmed.

*Geo. W. Richardson, A. D. DuLaney* and *Otis Wingo,*
for appellant.

1. A continuance should have been granted; defend-
ants were unduly hastened to trial. 94 Ark. 545.

2. The evidence is legally insufficient to support the
verdict.

3. An *alibi* was proven.

4. The court erroneously excluded testimony ma-
terial to the defense. Kirby's Digest, § 3135.

5. The remarks of the State's counsel were preju-
dicial.

*Abe Collins,* prosecuting attorney, for appellee.

Argues the facts and contends that the evidence is
ample to sustain a conviction, and that there are no er-
rors of law.

*Wm. L. Moose,* Attorney General, and *John P. Streepey,* Assistant, for appellee.

1. The continuance was properly refused. 60 Ark. 161-7; 108 Ark. 594; 118 Ark. 402-9; 79 *Id.* 594; 82 *Id.* 203; 86 *Id.* 317; 89 *Id.* 46; 100 *Id.* 149; 103 *Id.* 119.

2. The evidence fully sustains the verdict. 109 Ark. 130; *Ib.* 138.

3. There was error in excluding testimony. 80 Ark. 201; 86 *Id.* 108.

4. There were no prejudicial remarks.

McCULLOCH, C. J. The defendants, Hood and Jim Baldwin, were convicted of robbing the Bank of Gillham, a banking institution in the town of Gillham, in Sevier County, Arkansas. The defendants are brothers, and reside in the State of Oklahoma, about seventy or seventy-five miles from Gillham, and about ten miles from the town of Bismark, Oklahoma. The bank robbery occurred about 10:30 o'clock in the morning of Wednesday, March 3, 1915, the president of the bank, Dr. B. E. Hendricks, and Noah Rodgers, the bookkeeper, and a Mr. Sinclair being in the bank at the time. It was a very dark, rainy day, and at that particular hour the rain was pouring down in torrents. Two men walked into the bank, and when they approached the cashier's window, Rodgers, the bookkeeper, walked up to the window to wait on them, supposing they were customers. The men leveled their pistols at Rodgers, commanding him to throw up his hands, and they also pointed their pistols at Hendricks and Sinclair, who were sitting at the stove behind the railing, and compelled them, too, to throw up their hands. One of the men walked behind the railing and searched Hendricks and Sinclair, the other one remaining at the window. They threw down a sack on the floor and commanded Rodgers to go into the vault and get the bank's money and put it in the sack, which Rodgers did, pursuant to the command. He got the sum of $994.94, which was placed in the sack and made way with by the robbers. The robbers, when they secured the booty, required the three men in the bank to accompany them out into the street to a horse rack where the robbers had hitched their

horses. The three men were required to walk on up the hill away from the horse rack, which they did for a distance of twenty-five or thirty yards, and the robbers mounted their horses and made good their escape.

On Sunday, March 7, John Ross, a police officer, and J. G. Parker, a deputy sheriff, started out from Gillham to trail the robbers, Ross testifies that he saw the men as they galloped away and recognized one of them as Hood Baldwin, and that a short time afterward, during the same day, he examined the tracks of the horses at the rack and followed the tracks out of town as far as the Rolling Fork creek, and the next day took up the trail again and followed it about fourteen miles. He and Parker claim to have started the trail of the horses a few miles out from Gillham, along the public road, and followed it into Oklahoma, losing it at or near Glover creek. From there they went to Broken Bow, Oklahoma, thence back, in company with a couple of Oklahoma officers, to the town of Glover, and thence to Golden, and from there to the home of Louis Baldwin, a brother of the defendants. The next day they went over to Jim Baldwin's and found him and Hood Baldwin and a man named Anderson there, and arrested all three of them, and brought them back to Gillham.

Ross and Parker testified, as before stated, that they followed the tracks of the horses to Glover creek, and that the track of the larger horse was not seen on the other side of that creek, but that they picked up the track of the smaller horse on the other side of the creek. They found a black pony or horse at Jim Baldwin's, which answered the description of the small horse, and carried it back to Gillham with the prisoners for identification.

The defendants are identified by Rodgers, Hendricks and Sinclair as the men who entered the bank and robbed it. Rodgers positively identifies them both. Hendricks is positive in his identification of Jim Baldwin, but less positive as to Hood. Sinclair is positive in his identification of Hood Baldwin, but stated that he was not so positive in his identification of Jim Baldwin. The men

who robbed the bank are referred to by these witnesses as being of different sizes, one of them being spoken of as the "big robber," and the other as the "little man." In their identification they speak of Hood Baldwin as the "big robber," or the larger of the two, and of Jim Baldwin as the "little man." The witnesses state that after the men had walked up to the bank window and required those inside the railing to hold up their hands, Jim Baldwin remained at the window while Hood Baldwin went behind the railing and searched Sinclair and Doctor Hendricks and compelled Rodgers to go into the vault and get the money. Rodgers stated that Hood Baldwin accompanied him into the vault. There is other evidence, direct and circumstantial, in the identification of the two defendants as the two men who robbed the bank. The two horses they rode were described, one of them a large gray horse, and the other a small dark bay or black horse. Ross testified that as the robbers rode out of town, the gray horse fell, and he recognized the rider as defendant Hood Baldwin. Ed Wilder, who lives three-quarters of a mile west of Gillham, and his wife both testified that they saw two men riding by their house that morning, going toward Gillham, one of them on a brown horse and the other on a gray horse, and that between 10:30 and 11:30 o'clock, the same day, the men returned from the direction of Gillham, running their horses at full speed, and they identified the men as the two Baldwins. H. H. King, who lives seven miles from Gillham, in the direction of Hochatown, Oklahoma, testified that on the morning the bank was robbed he saw two men, answering the description of the defendants, riding by his house, one riding a gray horse, and the other a brown; and that on the Friday before that he saw these two men driving the same horses to a buggy, going in the direction of Gillham, and that late in the afternoon of that day they returned along the same route and by the same mode of conveyance.

The defendants produced a large number of witnesses, from near their homes in Oklahoma, who testified as to their good reputation for honesty, etc., in the com-

munity in which they live. They also introduced the testimony of witnesses that tended strongly to establish an alibi. Hood Baldwin testified that he was at home on his farm on March 3 and remained there all day, and he produced several witnesses who were there that day, and testified that he did not leave home. The undisputed evidence is that a terrific rainstorm prevailed all over that country on March 3, and that the rainfall was so heavy that all the streams in western Arkansas and eastern Oklahoma were overflowed. Witnesses were introduced who testified that Jim Baldwin was in Bismark, Oklahoma, on March 3. A merchant at that place testified that Jim Baldwin came into his store on March 3 and made purchases, and that he gave him a cash ticket of the purchases. He produced the duplicate ticket showing the date, March 3, and Jim Baldwin himself produced the original ticket showing the purchases made by him on that date. Another witness testified that he was present in the store at Bismark on March 3, and saw Jim Baldwin there, and saw him make various purchases from the merchant who testified in the case. The testimony of other witnesses tended to establish the fact that Jim Baldwin was in Bismark on March 3, and if that was true, it was impossible for him to have robbed the Bank of Gillham. Both of the accused men testified as witnesses in the case, and they gave a detailed account of their whereabouts on the day of the robbery, and for a day or two preceding and a day or two succeeding that date.

(1) Counsel for the accused argue very earnestly and forcefully, both in the brief and in the oral argument, that the great preponderance of the testimony is in favor of the defendants, to the effect that they were in Oklahoma on the day that the Bank of Gillham was robbed, and that they could not have been at Gillham on that day. Counsel rely, too, upon certain alleged discrepancies in the testimony of the witnesses who pretend to identify the accused as the men who robbed the bank. It can not be said, though, that there is not testimony of a very substantial nature identifying the defendants as the guilty

parties. The testimony is undoubtedly legally sufficient to support the verdict. It is very difficult for judges of an appellate court to determine, merely from reading the record, where the real weight of the testimony lies. That can not be determined merely by comparison of the number of witnesses on the respective sides who testify on any given issue. Much is left, necessarily, to the judgment and fair discretion of the men composing the jury, who have the opportunity to hear the witnesses testify and observe their demeanor while upon the witness stand. That is the reason why, under our system of laws the weight and sufficiency of the evidence in trials at law are left to the trial jury. It is too well settled for further controversy that when we find in the record testimony which is legally sufficient to sustain the verdict, it is our duty as judges of the appellate court to leave the verdict undisturbed, unless it appears that errors of law have occurred which might have operated to the prejudice of the losing party.

(2)   Counsel assign a number of rulings of the court as errors which they insist prejudiced the rights of their clients. In the first place, it is argued that the defendants were hurried into trial without an opportunity to prepare their defense and to submit it to the jury. The defendants were brought back to Gillham under arrest on March 12, and were confined in jail until they were indicted at an adjourned term of the circuit court on March 29, the court having adjourned over from March 5, 1915, to that date. They waived arraignment on April 1, and, after entering pleas of not guilty, filed a motion for a postponement until April 5, which the court overruled, and the trial was begun. The defendants had from the date they were brought back to Sevier County, March 12, until April 1, to prepare for trial, and it can not be said under those circumstances that the court abused its discretion in prematurely forcing them to trial. They asked for the postponement in order to procure the attendance of witnesses Marlie Adams and Ab Ashford. The names of other witnesses were included in the motion, but it ap-

pears that the attendance of the other witnesses was procured. The attendance of neither Adams nor Ashford was procured. It is alleged in the motion that Adams would testify, if present, that he resided with his father near Gillham, and that he recognized one Mobbs as one of the parties who rode out from Gillham on the day of the bank robbery. It is alleged that Ashford would testify, if present, that he was acquainted with the defendants, and that on the day of the bank robbery he saw two men at or near Mountain Fork, in McCurtain County, Oklahoma, going westward, who were riding horses of the same description as the description given of the horses said to belong to the men who committed the robbery; and that when he first saw the parties he thought they were the defendants, but that when he got closer to them he ascertained that they were other parties who were strangers to him, and not the defendants.

(3) The allegations of the petition, except that which relates to the substance of the testimony of the absent witnesses, are entirely formal, and it is not shown specifically where the two absent witnesses were, nor was any reason given why their attendance could not have been procured along with the numerous other witnesses who were brought from Oklahoma. It was shown by the State on the hearing of the motion that Adams had left the country some time before that date, and it was not shown that his attendance could have been procured. The witness stated that when Adams left he went in company with a man who was accused of another crime, and that Adams himself said that he was going away on account of having seduced a girl in the neighborhood. The defendant only asked for a postponement until April 5, and it was not shown that there was any probability of being able to get either of the witnesses. It does not appear from the motion where Ashford lived nor where he was at the time of the trial. We do not think that enough was shown with respect to either one of the witnesses to justify us in finding that the court abused its discretion in overruling the motion. The defendants did in fact procure a large number of witnesses who testified

both as to their reputations for honesty and also as to the fact that they were at their homes and could not have been in Gillham on the day of the bank robbery. The testimony of the two absent witnesses, while not of the precise character of testimony as that of other witnesses who were introduced, was, after all, in the nature of cumulative evidence, and the court was not bound to postpone the trial to give time to produce it. At least, it can not be said that there was an abuse of discretion in so refusing to give further time.

(4)   It is next argued that the court erred in interrupting the cross-examination of witness Parker, and in commenting upon the conduct of counsel in conducting the cross-examination. Parker, as will be remembered, was, according to the testimony, one of the parties who trailed the defendants into Oklahoma, arrested them and brought them back to Arkansas. After the cross-examination had progressed to a considerable length, counsel asked the witness this question: "When was it you started out on this trailing expedition with reference to the date the bank was robbed?" Mr. Lake, one of the counsel assisting the prosecution, then remarked: "He has already stated that it was on Sunday he started out." The court then made the following ruling and comment: "It isn't proper to repeat on cross-examination the same things he testified and said on direct examination. It is a waste of time for you to repeat the same things on cross-examination. That is not cross-examination at all. He stated twice that he started out on Sunday, the 6th of March." It is insisted that the court erred, not only in interrupting the cross-examination and in holding as a matter of law that repetition of questions propounded on direct examination was not proper cross-examination, but that the comment of the court tended to discredit defendants' counsel before the jury and to bolster up the witness being cross-examined. We do not think there is any prejudicial error apparent from the incident or that it is at all probable that any prejudice could have resulted. The witness had in fact stated more than once that he and Ross started out

on the trip in search of the robbers—on the trailing expedition, to use the words of defendants' counsel—on the Sunday following the robbery of the bank, and in this the witness was corroborated by the undisputed evidence of Ross. There was no dispute on that point, and the court was correct in stating to the jury that that fact was undisputed, and it can not be seen that any prejudice resulted from stopping the cross-examination on so plain a proposition. The extent of cross-examination of a witness is in some measure within the control and discretion of the trial court. It is the duty of the trial judge to see that it is not unduly prolonged or that useless and immaterial questions are asked, or that questions relating to undisputed matters are repeated. Nor do we find anything in the language of the court which would discredit counsel for the defendants in their efforts in behalf of their clients before the jury, or bolster up the witness. The court merely stated his views on the subject and mentioned the undisputed testimony on the point involved. There was no error.

(5) It is urged that the court erred in refusing to permit the defendant's counsel to ask witness Britton the following question, with respect to the topography of the locality in Oklahoma where defendants lived: "In that country, is fifteen or twenty miles regarded as a great distance?" The witnesses were permitted to testify concerning the topography of the country, and the fact that it was very sparsely settled, and the court was correct in excluding the question stated above. It called merely for the opinion of the witness on a matter which could be shown by more direct and definite statement of facts.

(6-7) Another assignment relates to the examination of the same witness where the court refused to permit counsel for defendants to ask him whether or not the reputation of one of the defendants was "so exemplary that it had been a matter of remark and talk in the community." The question was also put in this form: "I will ask you this question, Mr. Britton, if his reputation has not been such, as a peaceable, law-abiding man, that

it has caused comment where he lives?" And again the question was asked as follows: "Has there been anything in his conduct as a peaceable, law-abiding man that has caused it to be discussed?" The court permitted counsel to ask the witness the customary questions calculated to elicit the testimony concerning the reputation of the accused in the respective communities in which they lived. All these questions were argumentative in their nature, and called for answers not contemplated by the principles of the law which admit that character of testimony. No error was committed in refusing to permit the witness to answer the questions. Another answer to the assignment is that it is not shown what the witness would have said in response to the questions. Therefore, prejudicial effect of the refusal to allow counsel to propound the questions is not apparent. It is true that these questions were propounded as a result of certain cross-examination of the witness, but we think the questions on cross-examination did not make these questions pertinent or proper.

(8)    Another assignment relates to the ruling of the court in permitting the State's counsel to recall one of defendants' witnesses and ask him if he had not stated that he was satisfied, after having seen the defendants, that the officers had arrested the right parties who were the bank robbers. The witness answered that he did not make any such statement, and there the matter ended. There could have been no prejudice in asking the question when it was answered by the witness in the negative.

(9)    There are several assignments of error with respect to the statements of counsel for the State in opening the case to the jury, and also in the argument to the jury after the testimony was in. The objections of the defendants were sustained, and there was no prejudice which might have resulted from the incident. At least, the court ruled in favor of the defendants upon their objections to the statements of counsel, and the remarks are not of such a character, as we can say that prejudice resulted which the court could have removed by a more emphatic ruling. The court in effect told the jury that the matters referred

to were not competent evidence and should be disregarded, and we must assume that the jury were intelligent men and were disposed to follow directions of the court.

(10) The only remaining assignment of error is that the court denied the defendants the right of being present at the time the motion for new trial was presented to the court and overruled. The record shows that on the day the motion was presented, the defendants appeared by their attorneys and requested the court to make an order causing the defendants to be brought forward in their own proper persons so as to be present at the hearing of the motion. This request was overruled. It does not appear that any new matter was presented in the motion for new trial, but the assignments therein all related to matters which occurred at the trial. There was, therefore, no hearing except upon the face of the motion itself. The constitutional guaranty is that a defendant shall have a right "to a speedy and public trial by an impartial jury," and that he shall have "compulsory process for obtaining witnesses in his favor and to be heard by himself and his counsel." Article 2, section 10, Constitution of 1874. The statutes of the State also provide that in indictments for felony, the defendant must be present during the trial. Kirby's Digest, section 2339. These provisions relate to the trial itself, and as the trial ended with the verdict of the jury, there was no denial of the constitutional or statutory right in hearing and considering the motion for new trial in the absence of the accused themselves. The steps taken subsequent to the verdict constituted merely efforts to get the verdict set aside, and did not constitute a part of the trial itself. The motion for a new trial may be presented and heard in the absence of the defendant, unless there is an issue of fact presented at the hearing or some reason shown in the nature of the presentation of the subject-matter of the motion which calls for the presence of the accused.

Mr. Bishop, in his work on Criminal Procedure (vol. 1, section 269), in speaking of the necessity for the presence of the accused at the hearing of a motion, says: "But

if it relates to a mere matter of law, or if in any other form a question simply of law is agitated, the better doctrine both in reason and authority is, that he may be absent at the argument unless the court sees fit to require his presence. For where no fact *in pais* is involved, and all is of law, there is nothing which a lay prisoner can do or suggest in the case; his interests are then wholly in the keeping of his counsel.''

The same author, speaking at another place in the same volume (section 276), and after pointing out the distinction between those occasions which do require the presence of the accused, and those which do not, says: ''Those distinctions conduct to the conclusion that the prisoner's presence should be required or not, at a hearing for a new trial, according to the particular question. If it is of mere law, the presence is not as of course essential; but if the defendant is not in custody, the court may demand it as a means of getting possession of him. If the hearing is attended by an inquiry into a fact, the common rule that the defendant must be present prevails.''

There are authorities to the contrary, and Mr. Bishop calls attention to them; but we think that his views on the subject are sound, and that where, after the trial is ended, there is a hearing on the motion which involves no inquiry of fact, the presence of the accused is not essential.

Judgment affirmed.