265 P.2d 670

**STATE v. CLARKSON.**

No. 5672.

Supreme Court of New Mexico.

Jan. 12, 1954.

McAtee & Toulouse, Albuquerque, for appellant.

Richard H. Robinson, Atty. Gen., William J. Torrington, Fred M. Standley, Asst. Attys. Gen., for appellee.

McGHEE, Chief Justice.

The defendant was found guilty on both counts of an information which charged, in

the first count, involuntary manslaughter committed with an automobile, and in the second, failing to stop at the scene of an accident which resulted in the death of William W. Wagner. Both the defendant and the deceased were sergeants in the army.

The deceased, Thomas H. Patterson and two ladies had attended a picture show at a drive-in theater on West Central Avenue in Albuquerque, New Mexico, on the evening of the fatal accident in a car recently purchased by Wagner. They left the theater grounds shortly after midnight, drôve upon Central Avenue and then east in the right-hand lane of traffic approximately one block, when the lights on the car failed and the engine stalled. Wagner got the parking and tail lights burning, but the battery was too weak to start the engine; whereupon, with Patterson on the left side and Wagner on the right side, they started pushing the car off the black-top onto an eighteen-foot gravel shoulder. The street at this point had four paved lanes of travel, with a divider in the center. As the car was being pushed, the defendant and a woman companion were returning from a night club west of the theater where they had spent some three and a half hours dancing, during which time they testified each had drunk two "Coke Highs" with a jigger of bourbon, and in addition, the defendant said he had a beer at the bar. There is no proof they were under the influence of intoxicating liquor.

According to the statements made by Clarkson and his companion, which were introduced in evidence by the District Attorney, and not disproved so far as matters relating to the happening of the accident were concerned, and their testimony, as well as the testimony of Patterson as a witness for the state, the defendants drove up behind the Wagner car, started to turn to the left and go around it, and then turned sharply to the right onto the shoulder, striking the right rear fender and door of the Wagner car and also striking Wagner. The defendant's car continued east on the shoulder for 100 feet when it pulled back on the blacktop and continued to the home of the defendant some eight miles south of Albuquerque on the Isleta Highway. Wagner was found just one foot short of where Clarkson pulled back on the pavement and he died of shock some two days later. He had suffered a compound fracture of both legs below the knees. He had evidently been carried by the defendant's car to where he was found.

In their statements introduced by the state, and in their uncontroverted testimony, the defendant and his companion stated that as the defendant turned to the left to pass on that side of the Wagner car another car was approaching from the east with bright lights, and it looked as though such car was in the lane of traffic the defendant would have to take if he continued attempting to pass on the left, whereupon

he swung his car to the right and onto the shoulder of the road in an attempt to avoid striking the Wagner car.

The defendant and his companion gave their speed as 25 to 35 miles per hour as they were traveling east just before they came upon the stalled car. Patterson, while testifying for the state, would not give the speed of the defendant's car, but after several questions said he thought it was exceeding the speed limit of 30 miles per hour at the place of the accident. Later, when called as a witness for the defendant, he placed the speed at 55 or 60 miles per hour, all without explanation of the change. One of the policemen who investigated the accident stated there were tire marks on the pavement showing the defendant had applied his brakes a short distance back of the point of collision. The traffic was light at the time of the accident.

The above is, we believe, a fair summary of the evidence upon which the state secured a conviction of involuntary manslaughter.

The crucial instruction on the issue of manslaughter given by the trial court reads:

"9. You are further instructed that before you can bring in a verdict of guilty to the manslaughter charge you must be convinced beyond a reasonable doubt from all the evidence before you, that the defendant was totally and wantonly reckless, and if you find that he was not so reckless, then you are to bring in a verdict of not guilty to the charge of manslaughter."

The defendant assigns error because of the failure of the instruction to advise the jury that the reckless and wanton operation of the automobile by the defendant must have been the proximate cause of the death of Wagner before a verdict of guilty was authorized. We note the deficiency of the instruction in the respect pointed out, but it avails the defendant nothing because of his failure to point it out to the trial court before the instruction was read to the jury. Instead, he waited until the following day to make his record and will not now be heard to urge error on account of the instruction as given. State v. Compton, 1953, 57 N.M. 227, 257 P.2d 915; State v. Smith, 1947, 51 N.M. 328, 184 P.2d 301; and Trial Court Rule 70–108, § 42–1117, 1941 Compilation. Claimed errors in instructions must be pointed out to the trial court before they are read to the jury, to the end they may be corrected, and not made afterwards unless prevented by the judge, as in State v. Cummings, 1953, 57 N.M. 36, 253 P.2d 321. This is our rule and the trial courts lack authority to waive or change it.

The defendant did, however, sufficiently raise the question of the sufficiency of the evidence to sustain a conviction of

the offense of involuntary manslaughter by his motions for a directed verdict on that count at the close of the case in chief for the state, as well as at the close of all of the testimony, in that it was not shown the proximate cause of the death of Wagner was the wanton and reckless operation of a motor vehicle by the defendant, the issue upon which the state relied for a conviction. We agree with this contention, and hold the evidence insufficient to support a verdict of involuntary manslaughter.

The statements of the defendant and his companion which were introduced by the state and not controverted, negative any wanton or reckless operation of the car by the defendant, or any high speed, and they are corroborated to a great extent by Patterson, a witness for the state and a companion of Wagner on the night in question. There is no other testimony as to what occurred, so the evidence simply does not establish the proximate cause of the striking of the deceased was the wanton or reckless operation of a motor vehicle by the defendant. See State v. Garcia, 1953, 57 N.M. 665, 262 P.2d 233, for the effect of an exculpatory statement by a defendant introduced by the state, which is not disproved.

■ The wanton and reckless operation of an automobile which must be shown as the proximate cause of a death in order to secure a conviction for involuntary manslaughter where a human is killed by an automobile being driven by another is not different from that required to be shown under our guest statute § 68–1001, 1941 Compilation, before one injured may recover against his host driving the car. Had the companion of the defendant been injured in the accident we would not have affirmed a judgment in her favor for such injuries against her host on the record in this case and under the law as declared in our two recent guest statute cases, Menkes. v. Vance, 1953, 57 N.M. 456, 260 P.2d 368, and Smith v. Meadows, 1952, 56 N.M. 242, 242 P.2d 1006.

We turn now to a consideration of the claims of error in connection with the second count of the information, charging the defendant failed to stop his motor vehicle at the scene of an accident resulting in injury or death to any person, or involving damage to property.

There can be no doubt the defendant is guilty of this offense unless his defense, that immediately upon striking the Wagner car he suffered an attack of amnesia from which he did not recover until just before he reached his home some seven or eight miles south of Albuquerque on the Isleta Highway, is believed by a jury or they have a reasonable doubt as to its truth.

■ The defendant was a married man; his wife was ill in a hospital in Denver, Colorado; and he was out night-clubbing with a divorcee, which may have ac-

counted for his failure to stop. The amnesia defense, however, was a legitimate one under the law, and the trial court properly instructed the jury if it believed such defense was true, or if it had a reasonable doubt thereof, a verdict of not guilty should be returned on the second count.

The entire contest on this point, aside from testimony by the defendant that he had suffered a head injury because of being thrown by a horse when he was fifteen years of age and had an attack of amnesia as a result thereof, and had suffered another attack while in the crow's nest of a heavy cruiser which had been torpedoed during a battle off Guadalcanal Island during World War II, was between Dr. Ross for the defendant and Dr. Stewart for the state. Both are psychiatrists and their opinions were directly opposed to each other. In other words, Dr. Ross testified there was no doubt but that the defendant was suffering from amnesia as claimed, while Dr. Stewart testified this was not so, and that absent a head injury at the time of impact (and no claim of such injury was made) the defendant could not have had an attack of amnesia as claimed. It is clear the jury accepted the testimony of Dr. Stewart and rejected that of Dr. Ross.

During the cross-examination of Dr. Ross he was asked by the District Attorney whether he was being paid for his services in examining the defendant and testifying for him as an expert witness, and answered he had not been paid but expected the attorneys for the defendant to pay him. The defendant made practically the same inquiry of Dr. Stewart, whereupon the District Attorney made the following objection:

"Mr. Tackett: We object as to whether or not this witness is paid or not. He was not brought here under subpoena. He was good enough to come down at our telephone request."

The objection was sustained and the defendant excepted. This ruling is made the basis for the only substantial claim of error in connection with the second count.

The Attorney General relies on the failure of the defendant to make a tender of what Dr. Stewart would have answered, or what they expected him to answer, as announced in State v. Martin, 1926, 32 N.M. 48, 250 P. 842 and State v. Roybal, 1928, 33 N.M. 540, 273 P. 919, where it was held such tender was necessary to put the trial court in error, the first of these cases citing as authority Baldwin v. State, 1915, 119 Ark. 518, 178 S.W. 409 and Jackson v. State, 1907, 1 Ga.App. 723, 58 S.E. 272, 273. In turn the Jackson case quotes from Griffin v. Henderson, 1903, 117 Ga. 382, 43 S.E. 712 and continues as follows:

"* * * 'Where a question is asked, the answer excluded, and no statement made to the judge as to what the witness would have sworn, there is

nothing before the court. It is impossible for the judge on the motion for new trial, or for this court on a bill of exceptions, to say whether the complaining party would have been benefited or injured by the answer. The witness may not have known anything of the subject inquired about; and if a new trial should be granted because the answer was excluded, it might happen that on the second trial the question would be again propounded, allowed, and the witness give hearsay, inadmissible, or irrelevant testimony, or the answer might be harmful, instead of helpful, or the witness might reply, "I do not know," with the result that the time and money of the parties and the country had been wasted for so inconsequent a conclusion. That this is not unlikely to occur is shown by the experience of all practicing lawyers, who have often seen a long and heated argument as to the right to ask a question, followed by the laughter of all bystanders when the court held it competent, and the witness replied that he knew nothing about the matter. * * * It would never do to grant a new trial until it appeared, not only that the question was proper, but that the answer was material and would have been of benefit to the complaining party.' Griffin v. Henderson, 117 Ga. [382] 383, 43 S.E. 712. It may be considered that the strictness of this rule should be much relaxed in cross-examination; but even then, unless the nature of the question discloses the answer expected, the counsel should state to the court what he expects to prove, or, if he cannot make such statement, what he wants to prove by the witness. The right of cross-examination should in no case be abridged, but this right is granted in order to confer a substantial benefit; * * *.''

The court then said the answer to the question propounded could not have been material under any theory of the case and was properly excluded. It should be noted the questions in the Baldwin and Jackson cases, supra, were of an entirely different character than that before us. There, as is pointed out in the opinions by the courts, the answer might have been wholly irrelevant, hearsay or speculative

When we go back to the Jackson and Griffin cases, supra, illustrating the wisdom of the general rule, we find no justification for here invoking the apparent rule of the Martin and Roybal cases, supra. The witness could have answered only, "Yes," or "No," and we do not believe it will be disputed that the answer would have been, "Yes," and that such fact was within the knowledge of the District Judge trying the case who had the duty of approving the

disbursements in connection with the trial of this criminal case. We find this witness Stewart testifying as an expert again and again for the state in criminal cases coming to this court from Bernalillo County; he is a psychiatrist of statewide reputation, and it would be mockery for us to say the trial judge and district attorney did not know he was to be paid an expert's fee for his services. Things like that simply do not happen in the courts of a wealthy county like Bernalillo.

Furthermore, the questions asked in the Martin case [32 N.M. 48, 250 P. 847], supra, were not proper as cross-examination, and, as stated in the opinion, the court could not tell whether the claim the answers would have been admissible as part of the res gestae was well founded, in the absence of a statement of what it was expected the answers would be. In addition, the questions asked:

"As you were going out of the gate, passing outside the gate as you have just stated, did you hear any one say anything?"

and,

"What did your father say to you when he called to you?"

might well have brought objectionable answers.

In the Roybal case, supra [33 N.M. 540, 273 P. 921], the question propounded to the wife of the prosecuting witness was:

"Why did you call your husband and send word to him to come in when Venceslado came into the house?"

From the opinion it is clear the appellant had called the wife as his witness, and the claim was made she was hostile and that he should have been allowed to develop such fact by the question propounded. This court said no authorities were cited and no substantial arguments were presented in support of such claim; and no suggestion was made to the trial court as to the nature of the testimony sought to be elicited from the witness. Certainly the situation presented a proper case for the application of the general rule a tender must be made, but we have no such case here, and the attorneys on each side, the trial court and the witness knew the answer would be, "Yes."

Was it such a question as the defendant had a right to ask of the expert witness on cross-examination? We have ourselves turned to the books for a solution to the question and find all of the authorities answer in the affirmative. We will quote briefly from a few of the authorities:

In Underhill's Criminal Evidence, 4th Ed., § 400, we read:

"* * * on cross examination a witness * * * may be asked * * * if he has not been promised payment for his services, * * *"

The following cases cited in note 55 support the text: Ex parte Ford, 1925, 213 Ala. 410, 104 So. 840; Walker v. State, 1914, 10 Ala.App. 205, 64 So. 528; Stanfield v. State, 1929, 23 Ala.App. 60, 120 So. 467; Haithcock v. State, 1930, 23 Ala.App. 460, 126 So. 890; People v. Pantages, 1930, Cal.App., 292 P. 500; Gray v. Commonwealth, 1925, 208 Ky. 219, 270 S.W. 772; State v. Mulch, 1903, 17 S.D. 321, 96 N.W. 101; and Bullock v. State, 1925, 99 Tex.Cr. 543, 270 S.W. 1018.

In 3 Jones' Commentaries on Evidence, 2nd Ed., it is stated at p. 2454, § 1342, that it is well established that expert witnesses may be asked on cross-examination whether they have received a special fee for attending the trial, and, if so, what amount. He cites among others the cases of Alford v. Vincent, 1884, 53 Mich, 555, 19 N.W. 182, and Allen B. Wrisley Co. v. Burke, 1903, 203 Ill. 250, 67 N.E. 818, and we agree they support the text. We think the rule is fairly stated in syllabus one of Jones v. President, etc., of Village of Portland, 1891, 88 Mich. 598, 50 N.W. 731, 16 L.R.A. 437, as follows:

"The fact that a physician, who is employed to examine a person injured through the negligence of another, is employed for the express purpose of giving his testimony in a suit to be brought for such injury, does not make him an incompetent witness, but may be considered as affecting his credibility."

The only defense the defendant had to the charge of failing to stop at the scene of the accident was that he suffered an attack of amnesia, and he was largely dependent upon Dr. Ross to convince the jury it was genuine and not sham. On the other hand, the state was dependent in a large measure upon the ability of Dr. Stewart to break down this defense and convince the members of the jury Dr. Ross was in error in his conclusions. The state had shown that Dr. Ross was to receive an expert's fee for his examination of the defendant and testimony in his behalf, while the defendant was denied the right to show that Dr. Stewart was also to receive a fee as an expert witness, and his testimony was shielded from the suspicion it might have been influenced by the fee he expected to receive. This gave the state an undue advantage on the only controverted issue on the second count, and constituted reversible error.

The disposition made of the case as set out above makes it unnecessary to pass upon the other claimed errors.

The judgment of the District Court on the first and second counts of the information will be reversed, and the cause remanded with instructions to set aside the judgment, dismiss the charge of involuntary

manslaughter and grant the defendant a new trial on the second count of the information.

It is so ordered.

SADLER, COMPTON, LUJAN and SEYMOUR, JJ., concur.