308 P.2d 989

Manuel A. GOMEZ, Administrator of the Estate of Gilberto A. Gomez, deceased, and Luis L. Gomez, Plaintiffs-Appellants,

v.

Reynaldo RODRIGUEZ and Ricardo Rodriguez, Defendants-Appellees.

No. 6160.

Supreme Court of New Mexico.

March 18, 1957.

J. R. Wrinkle, Silver City, for appellants.

Whatley & Oman Las Cruces, H. O. Robertson, Silver City, for appellees.

SADLER, Justice.

The plaintiffs as appellants before this Court complain of the action of the trial court in directing a verdict for defendants at the conclusion of the trial of an action for damages for the death of a young, 17-year-old high school student under 1953 Comp. § 64–24–1, upon which a judgment of dismissal was entered against them. The statute mentioned is the so called "guest statute" which denies recovery to a passenger being transported in automobile without payment for transportation for injury, death or loss in an accident, unless the accident shall have been intentional on the part of the owner or operator, or caused by his heedlessness or reckless disregard of the rights of others.

The complaint is in two counts. In the first count, Manuel A. Gomez as administrator of the estate of Gilberto A. Gomez, deceased, seeks recovery of $25,000 under the statute mentioned against Ricardo Rodriguez as the owner, and Reynaldo Rodriguez as the driver of a certain Ford Tudor automobile on December 9, 1954, kept and maintained at the time by Ricardo Rodriguez, as a family purpose automobile which was wrecked by Reynaldo, the son of Ricardo, while driving it on the date mentioned with the decedent, Gilberto A. Gomez, as one of the passengers. In the second count, Luis L. Gomez, as the father of Gilberto Gomez, asks recovery against defendants for the sum of $617 representing the burial and funeral expenses paid out by him following the death of Gilberto. The parties will be referred to here as they were aligned below.

On the evening of December 9, 1954, Gilberto A. Gomez, a young student, 17 years of age, attending Hurley High School, was present at a dance being held in El Charro Night Club in Bayard, New

Mexico. About 11:30 p.m., the defendant, Reynaldo Rodriguez, 21 years of age, invited young Gomez and another youth named Ramon Barrajas, present at the dance, to go on a ride with him in the Rodriguez car. They agreed but before starting their number had been increased to four by Luis Silva who at the time gave some indication of having been drinking.

All entered the Rodriguez car which was in the parking lot of El Charro. The driver of the car, Reynaldo Rodriguez, backed out of the parking lot and took off on West Central Avenue with such speed as to attract the attention of Chief of Police Leslie K. Goforth, parked in his Ford car nearby. The officer threw his spotlight on the Rodriguez car and honked his horn but the driver failing to slow down, he immediately took off after him. He had turned on the blinkers, a red light on the top of his car while turning to chase the other car, and by the time his own car was well under way, he observed the Rodriguez car turning into Hurley Avenue, a street which intersects West Central.

While Rodriguez was going west from El Charro and in the vicinity of 76 Service Station, one of the passengers in his car, Barrajas, saw the red blinkers on the police car and so advised Rodriguez and informed him that he was being followed to which Rodriguez retorted that he knew what he was doing. All the while Rodriguez was increasing the speed of his car. The speed limit along Hurley Boulevard was 25 miles per hour and a sign along the street so read. Young Gomez inquired of Rodriguez why he did not stop the car and got the same answer as that given Barrajas, namely, that he knew what he was doing and continued on his way.

At the intersection of Hurley Avenue, or Boulevard, as it was as frequently called, with West Central, there was a "Stop" sign with which Rodriguez was familiar but on this occasion it did not cause him to stop. There was also a sort of gadget or rubber stop sign attached to the highway at this point. Passing the stop signs without stopping, and just before turning off Hurley Boulevard into old 260, the Rodriguez car came very near turning over in making the turn.

Just before reaching the turn one of the passengers, Barrajas, again saw the red blinker on the police car, a fact noticed by Silva who asked Rodriguez why he did not stop there and let the Chief of Police take them. The same reply was forthcoming again, namely, that he knew what he was doing. It was apparent by the tone of his voice that by this time Rodriguez was becoming annoyed by the several inquiries as to why he did not stop his car and permit the officer to take them into custody.

Apparently, Hurley Boulevard is also known as Highway 260, or "new" 260 and it was in attempting to negotiate the turn

from it into old 260 that the fleeing car came very near turning over. It was also at this point that the engine of the Rodriguez car died and came to a complete stop. Whether by reason of the brevity of the stop, or otherwise, none of the passengers got out, or offered to do so.

It was from this point on that the Rodriguez car really picked up speed. The police car had been outdistanced and at one point between the beginning of the chase and the site of the wreck, presently to be mentioned, the Rodriguez car was completely lost to view of the Chief of Police driving the pursuing car.

After getting on to old 260, the Rodriguez car traveled at speeds variously estimated as between 75 and 80 miles per hour in the straightaway, that is to say, the Chief of Police said he himself was traveling at the rate of between 75 and 80 miles per hour and was unable to gain on the Rodriguez car. The officer testified:

"Q. And after you crossed, I believe you testified you crossed the railroad tracks, did you see the defendant's automobile travelling on this stretch of road as shown in Plaintiff's Exhibit 8? A. Yes, sir, I saw him quite a bit ways down the highway.

"Q. And did you drive down this stretch of road that is shown here? A. Yes, sir.

"Q. How fast did you drive down that road? A. Well when I hit this part of the highway here, (Reporter's Note: He points to the exhibit) past the railroad crossing, I was going 75, between 75 and 80.

"Q. 75 and 80 miles an hour? A. Yes.

"Q. Were you able to gain on the automobile driven by the defendant, Reynaldo Rodriguez? A. No, sir."

In order to make a long story short, there was down the highway a curve so sharp and dangerous that it acquired a name in the community as "dead man's curve." The defendant who was driving the fleeing car, Reynaldo Rodriguez, admitted he was familiar with this curve. Indeed, he had traveled the highway between Bayard and Hurley many times. It was toward it that he continued the mad race between him and the pursuing police car, occupied and driven by Chief of Police Goforth.

Of course, and, inevitably, when the driver of the fleeing car reached "dead man's curve," he came to grief. The car first went off the paving, skidded for a long distance and then as shown by the absence of tire marks at a certain point hurtled more than one hundred feet through the air and landed upside down in an arroyo.

Testimony of John Turney of conditions at the scene of the wreck give a pretty fair idea of the speed at which the car must have

been traveling when wrecked and conditions as they existed. He assisted in taking measurements and testified:

"Q. Now, Mr. Turney, if you will step down here a minute, so that we can identify the exact place that this took place, referring to this Exhibit, this Exhibit, here, which is 'dead man's corner' as you have mentioned it, is that on and around at this direction towards that driveway, was that where you took the measurements? A. Yes, sir.

"Q. Did you see any tire marks on the pavement? A. Yes, sir, I did.

"Q. And where did they begin, with reference to the curve in the road there? A. Well, they began down the road 435 feet.

"Q. From what? A. From the land that went off of the highway into this house.

"Q. 435 feet, was that on the oil? A. Yes, sir, that was on the oil.

"Q. On the oil? A. Yes.

"Q. Were there any marks made off of the oil? A. Yes, sir, on the shoulder there were 150 feet of tracks.

"Q. And where was that in relation to where this driveway goes in? A. That goes up to the driveway.

"Q. Up to the driveway? A. Yes.
"Q. Now, as I understand it, there was 435 feet of marks on the oil? A. Yes.

"Q. And 150 off the oil up to the driveway? A. Yes, sir.

"Q. Did you see any tracks from the driveway on toward the automobile? A. No, from this place to where the car was wrecked was 135 feet.

"Q. From this place, what do you mean by this place? A. Where you cross the land at the road.

"Q. That's where you last saw the tracks? A. Yes.

"Q. Now, did you see anything in between where you last saw the tracks there at this driveway up towards where the car was lying, did you see any other indication or disturbance of the ground between those two points? A. Nothing, only where the car hit and bounced.

"Q. You say it hit? A. Yes.

"Q. Where was that? What did you see there? A. Well that was where it went off into this cut.
" *　　*　　*　　*　　*　　*

"The Witness: It was that flat place there, where we saw the car go off, where the car went off rather.

"Q. That's where you saw the tracks, or what? A. Where the car hit.

"Q. How far would you say that was from where you last saw the tracks at the driveway? A. 135 feet.

"Q. That's where the car come to rest? A. Yes.

"Q. What I'm getting at is this. How far from where the car come to rest was it to where you say that you said it looked like it hit on the top? A. That's 150 feet from the road.

" * * * * * *

"Q. Alright now, did you see any other disturbance on the ground, other than that one that you testified about, between where the last tracks were shown by the driveway and where the car come to rest? A. No, I don't remember it, only where the car went off into the ravine.

"Q. Where it come to rest, you mean? A. Yes.

"Q. And what did you see there? A. Well there was where he had hit the bank, there was loose dirt, fresh loose dirt.

"Q. And that's where it come to rest? A. Yes.

"Q. Now did you at any time examine this automobile after the accident? A. No, nothing more than just looked at it.

"Q. Looked at it? A. Yes.

"Q. Alright, what was its general condition? A. It was wrecked, it was tore up.

"Q. Did you make any examination of the frame or the motor? A. No.

"Q. You didn't do that? A. No."

As a result of the foregoing accident the young boy, Gilberto A. Gomez, was killed, dying before he could receive hospitalization and other passengers in the car, including the driver, received injuries of varying degrees of seriousness, none fatal, however. In due season, this action was begun to recover damages for the death of Gilberto Gomez; by his father to recover the expenses of his funeral and burial. The two causes of action were joined in a single complaint, though in separate counts. No point is raised by defendants on the possible misjoinder of causes of action or parties, nor do we wish to intimate a view as to whether there exists such a misjoinder.

■ Throughout his brief, counsel for the plaintiffs refers to this action as one for "death by wrongful act." We share the same doubt as the trial judge as to the propriety of so designating it. It is a simple action for damages for a death under the guest statute, viz., 1953 Comp., § 64-24-1—no more, no less. It can only tend to confuse to designate it as an action for damages under our death by wrongful act statute.

■ The single question presented is whether the trial court improperly directed a verdict for the defendants at the close of plaintiff's case. We think it did. Since its enactment, we have dealt with the true meaning of the so called "guest statute", 1953 Comp., § 64–24–1, in a number of decisions. See, Downing v. Dillard, 55 N.M. 267, 232 P.2d 140; Smith v. Meadows, 56 N.M. 242, 242 P.2d 1006; Menkes v. Vance, 57 N.M. 456, 260 P.2d 368; State v. Clarkson, 58 N.M. 56, 265 P.2d 670; Carpenter v. Yates, 58 N.M. 513, 273 P.2d 373; De Blassie v. McCrory, 60 N.M. 490, 292 P.2d 786.

A review of the foregoing cases satisfies us there is nothing said in any of them denying sufficiency of the facts in this case for submission to the jury on the issue of whether the acts of the defendant, driver of the lead car in the race that ended in death for one of its passengers, amounted to that heedlessness or reckless disregard of the rights of others, denounced by the statute. We are prepared to admit the conduct on his part was not so grave as to make "intentional," within the meaning of the statute, what followed. We held in Smith v. Meadows, supra, that speed alone will not suffice to meet the test of the guest statute.

But here we have much more. Only shortly before the driver had imbibed sufficiently of liquor as to be not entirely free of its effect. There was ample evidence for the jury to believe he was fully aware he was being pursued by a police car with an armed driver at the wheel who, at any moment might open fire on his car. And, yet he roared down a winding highway with which he was thoroughly familiar at top speed disregarding numerous warnings from his passengers, toward "dead man's curve," heedless of the safety of his passengers, until his mad race with death ended in death to one of them.

In Carpenter v. Yates, supra [58 N.M. 513, 273 P.2d 375], we said:

"It is our conclusion that the trial court was correct in its ruling. There is no claim of intentional injury here; absent that, it is our understanding of the principles already enunciated by this Court that there must be some substantial evidence of a particular state of mind upon the part of the defendant driver. That particular state of mind comprehends evidence of an utter irresponsibility on the part of defendant or of a conscious abandonment of any consideration for the safety of passengers; as indicated in State v. Clarkson, supra, there is a close alignment between the state of mind required by this statute and a state of mind sufficient to convict for invol-

untary manslaughter for a death resulting from the operation of an automobile. * * *"

If the facts here present do not present a case for the jury on violation of the questioned statute, then, it is truly difficult to conceive of facts that would. If "dead man's curve" turned at the point it does to carry the driver away from a precipitous bluff or bottomless lake only a short distance beyond, none would question that a driver racing toward it at the speed here shown not only was heedless of danger to himself and others but bereft of reason as well. Considering contour of the terrain where the accident did happen and where the car landed, upside down, after a broad flight through the air in failing to make "dead man's curve," there is but little difference in degree between the supposed case and the actual conditions present at scene of the crash.

It follows from what has been said that the trial court erred in directing a verdict for defendants. Its judgment will be reversed and the cause remanded with direction to set aside its judgment and award plaintiffs a new trial. The plaintiffs will recover their costs.

It is so ordered.

LUJAN, C. J., and McGHEE, COMPTON and KIKER, JJ., concur.